# LAIRD, SECRETARY OF DEFENSE, ET AL. *v.* TATUM ET AL.

No. 71–288. Argued March 27, 1972—Decided June 26, 1972

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion in which MARSHALL, J., joined, *post,* p. 16. BRENNAN, J., filed a dissenting opinion in which STEWART and MARSHALL, JJ., joined, *post,* p. 38.

1

2

 

*Solicitor General Griswold* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Mardian* and *Robert L. Keuch.*

*Frank Askin* argued the cause for respondents. With him on the brief was *Melvin L. Wulf.*

*Sam J. Ervin, Jr.,* argued the cause for the Unitarian Universalist Assn. et al. as *amici curiae* urging affirmance. With him on the brief was *Lawrence M. Baskir.*

*Burke Marshall* and *Arthur R. Miller* filed a brief for a Group of Former Army Intelligence Agents as *amici curiae* urging affirmance.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Respondents brought this class action in the District Court seeking declaratory and injunctive relief on their claim that their rights were being invaded by the Department of the Army's alleged "surveillance of lawful and peaceful civilian political activity." The petitioners in response described the activity as "gathering by lawful means . . . [and] maintaining and using in their intelligence activities . . . information relating to potential or actual civil disturbances [or] street demonstrations." In connection with respondents' motion for a preliminary injunction and petitioners' motion to dismiss the complaint, both parties filed a number of affidavits with the District Court and presented their oral arguments at a hearing on the two motions. On the basis of the pleadings,[1] the affidavits before the court, and the oral arguments advanced at the hearing, the

---

[1] The complaint filed in the District Court candidly asserted that its factual allegations were based on a magazine article: "The information contained in the foregoing paragraphs numbered five through thirteen [of the complaint] was published in the January 1970 issue of the magazine *The Washington Monthly* . . . ."

District Court granted petitioners' motion to dismiss, holding that there was no justiciable claim for relief.

On appeal, a divided Court of Appeals reversed and ordered the case remanded for further proceedings. We granted certiorari to consider whether, as the Court of Appeals held, respondents presented a justiciable controversy in complaining of a "chilling" effect on the exercise of their First Amendment rights where such effect is allegedly caused, not by any "specific action of the Army against them, [but] only [by] the existence and operation of the intelligence gathering and distributing system, which is confined to the Army and related civilian investigative agencies." 144 U. S. App. D. C. 72, 78, 444 F. 2d 947, 953. We reverse.

## (1)

There is in the record a considerable amount of background information regarding the activities of which respondents complained; this information is set out primarily in the affidavits that were filed by the parties in connection with the District Court's consideration of respondents' motion for a preliminary injunction and petitioners' motion to dismiss. See Fed. Rule Civ. Proc. 12(b). A brief review of that information is helpful to an understanding of the issues.

The President is authorized by 10 U. S. C. § 331 [2] to make use of the armed forces to quell insurrection

---

[2] "Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection."

The constitutionality of this statute is not at issue here; the specific authorization of such use of federal armed forces, in addition to state militia, appears to have been enacted pursuant to Art. IV, § 4, of the Constitution, which provides that "[t]he United

4

and other domestic violence if and when the conditions described in that section obtain within one of the States. Pursuant to those provisions, President Johnson ordered

States . . . shall protect each of [the individual States] . . . on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."

In describing the requirement of 10 U. S. C. § 331 for the use of federal troops to quell domestic disorders, Attorney General Ramsey Clark made the following statements in a letter sent to all state governors on August 7, 1967:

"There are three basic prerequisites to the use of Federal troops in a state in the event of domestic violence:

"(1) That a situation of serious 'domestic violence' exists within the state. While this conclusion should be supported with a statement of factual details to the extent feasible under the circumstances, there is no prescribed wording.

"(2) That such violence cannot be brought under control by the law enforcement resources available to the governor, including local and State police forces and the National Guard. The judgment required here is that there is a definite need for the assistance of Federal troops, taking into account the remaining time needed to move them into action at the scene of violence.

"(3) That the legislature or the governor requests the President to employ the armed forces to bring the violence under control. The element of request by the governor of a State is essential if the legislature cannot be convened. It may be difficult in the context of urban rioting, such as we have seen this summer, to convene the legislature.

"These three elements should be expressed in a written communication to the President, which of course may be a telegram, to support his issuance of a proclamation under 10 U. S. C. § 334 and commitment of troops to action. In case of extreme emergency, receipt of a written request will not be a prerequisite to Presidential action. However, since it takes several hours to alert and move Federal troops, the few minutes needed to write and dispatch a telegram are not likely to cause any delay.

"Upon receiving the request from a governor, the President, under the terms of the statute and the historic practice, must exercise his own judgment as to whether Federal troops will be sent, and as to such questions as timing, size of the force, and federalization of the National Guard.

"Preliminary steps, such as alerting the troops, can be taken by

federal troops to assist local authorities at the time of the civil disorders in Detroit, Michigan, in the summer of 1967 and during the disturbances that followed the assassination of Dr. Martin Luther King. Prior to the Detroit disorders, the Army had a general contingency plan for providing such assistance to local authorities, but the 1967 experience led Army authorities to believe that more attention should be given to such preparatory planning. The data-gathering system here involved is said to have been established in connection with the development of more detailed and specific contingency planning designed to permit the Army, when called upon to assist local authorities, to be able to respond effectively with a minimum of force. As the Court of Appeals observed,

> "In performing this type function the Army is essentially a police force or the back-up of a local police force. To quell disturbances or to prevent further disturbances the Army needs the same tools and, most importantly, the same information to which local police forces have access. Since the Army is sent into territory almost invariably unfamiliar to most soldiers and their commanders, their need for information is likely to be greater than that of the hometown policeman.
>
> "No logical argument can be made for compelling the military to use *blind* force. When force is em-

---

the Federal government upon oral communications and prior to the governor's determination that the violence cannot be brought under control without the aid of Federal forces. Even such preliminary steps, however, represent a most serious departure from our traditions of local responsibility for law enforcement. They should not be requested until there is a substantial likelihood that the Federal forces will be needed."

This analysis of Attorney General Clark suggests the importance of the need for information to guide the intelligent use of military forces and to avoid "overkill."

ployed it should be intelligently directed, and this depends upon having reliable information—in time. As Chief Justice John Marshall said of Washington, 'A general must be governed by his intelligence and must regulate his measures by his information. It is his duty to obtain correct information . . . .' So we take it as undeniable that the military, i. e., the Army, need a certain amount of information in order to perform their constitutional and statutory missions." 144 U. S. App. D. C., at 77–78, 444 F. 2d, at 952–953 (footnotes omitted).

The system put into operation as a result of the Army's 1967 experience consisted essentially of the collection of information about public activities that were thought to have at least some potential for civil disorder, the reporting of that information to Army Intelligence headquarters at Fort Holabird, Maryland, the dissemination of these reports from headquarters to major Army posts around the country, and the storage of the reported information in a computer data bank located at Fort Holabird. The information itself was collected by a variety of means, but it is significant that the principal sources of information were the news media and publications in general circulation. Some of the information came from Army Intelligence agents who attended meetings that were open to the public and who wrote field reports describing the meetings, giving such data as the name of the sponsoring organization, the identity of speakers, the approximate number of persons in attendance, and an indication of whether any disorder occurred. And still other information was provided to the Army by civilian law enforcement agencies.

The material filed by the Government in the District Court reveals that Army Intelligence has field offices in various parts of the country; these offices are staffed in the aggregate with approximately 1,000 agents, 94%

of whose time [3] is devoted to the organization's principal mission,[4] which is unrelated to the domestic surveillance system here involved.

By early 1970 Congress became concerned with the scope of the Army's domestic surveillance system; hearings on the matter were held before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary. Meanwhile, the Army, in the course of a review of the system, ordered a significant reduction in its scope. For example, information referred to in the complaint as the "blacklist" and the records in the computer data bank at Fort Holabird were found unnecessary and were destroyed, along with other related records. One copy of all the material relevant to the instant suit was retained, however, because of the pendency of this litigation. The review leading to the destruction of these records was said at the time the District Court ruled on petitioners' motion to dismiss to be a "continuing" one (App. 82), and the Army's policies at that time were represented as follows in a letter from the Under Secretary of the Army to Senator Sam J. Ervin, Chairman of the Senate Subcommittee on Constitutional Rights:

> "[R]eports concerning civil disturbances will be limited to matters of immediate concern to the Army—that is, reports concerning outbreaks of violence or incidents with a high potential for violence beyond the capability of state and local police and

---

[3] Translated in terms of personnel, this percentage figure suggests that the total intelligence operation concerned with potential civil disorders hardly merits description as "massive," as one of the dissents characterizes it.

[4] That principal mission was described in one of the documents filed with the District Court as the conducting of "investigations to determine whether uniformed members of the Army, civilian employees [of the Army] and contractors' employees should be granted access to classified information." App. 76–77.

the National Guard to control. These reports will be collected by liaison with other Government agencies and reported by teletype to the Intelligence Command. They will not be placed in a computer . . . . These reports are destroyed 60 days after publication or 60 days after the end of the disturbance. This limited reporting system will ensure that the Army is prepared to respond to whatever directions the President may issue in civil disturbance situations and without 'watching' the lawful activities of civilians." (App. 80.)

In briefs for petitioners filed with this Court, the Solicitor General has called our attention to certain directives issued by the Army and the Department of Defense subsequent to the District Court's dismissal of the action; these directives indicate that the Army's review of the needs of its domestic intelligence activities has indeed been a continuing one and that those activities have since been significantly reduced.

### (2)

The District Court held a combined hearing on respondents' motion for a preliminary injunction and petitioners' motion for dismissal and thereafter announced its holding that respondents had failed to state a claim upon which relief could be granted. It was the view of the District Court that respondents failed to allege any action on the part of the Army that was unlawful in itself and further failed to allege any injury or any realistic threats to their rights growing out of the Army's actions.[5]

---

[5] In the course of the oral argument, the District Judge sought clarification from respondents' counsel as to the nature of the threats perceived by respondents; he asked what exactly it was in the Army's activities that tended to chill respondents and others in

In reversing, the Court of Appeals noted that respondents "have some difficulty in establishing visible injury":

> "[They] freely admit that they complain of no specific action of the Army against them . . . . There is no evidence of illegal or unlawful surveillance activities. We are not cited to any clandestine intrusion by a military agent. So far as is yet shown, the information gathered is nothing more than a good newspaper reporter would be able to gather by attendance at public meetings and the clipping of articles from publications available on any newsstand." 144 U. S. App. D. C., at 78, 444 F. 2d, at 953.

The court took note of petitioners' argument "that nothing [detrimental to respondents] has been done, that nothing is contemplated to be done, and even if some action by the Army against [respondents] were possibly foreseeable, such would not present a presently justiciable controversy." With respect to this argument, the Court of Appeals had this to say:

> "This position of the [petitioners] does not accord full measure to the rather unique argument advanced by appellants [respondents]. While [respondents] do indeed argue that in the future it is possible that

---

the exercise of their constitutional rights. Counsel responded that it was

"precisely the threat in this case that *in some future civil disorder* of some kind, the Army is going to come in with its list of troublemakers . . . and go rounding up people and putting them in military prisons somewhere." (Emphasis added.)

To this the court responded that "we still sit here with the writ of habeas corpus." At another point, counsel for respondents took a somewhat different approach in arguing that

*"we're not quite sure exactly what they have in mind* and that is precisely what causes the chill, the chilling effect." (Emphasis added.)

information relating to matters far beyond the responsibilities of the military may be misused by the military to the detriment of these civilian [respondents], yet [respondents] do not attempt to establish this as a definitely foreseeable event, or to base their complaint on this ground. Rather, [respondents] contend that the *present existence of this system* of gathering and distributing information, allegedly far beyond the mission requirements of the Army, constitutes an impermissible burden on [respondents] and other persons similarly situated which exercises a *present inhibiting effect* on their full expression and utilization of their First Amendment rights . . . ." *Id.,* at 79, 444 F. 2d, at 954. (Emphasis in original.)

Our examination of the record satisfies us that the Court of Appeals properly identified the issue presented, namely, whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose. We conclude, however, that, having properly identified the issue, the Court of Appeals decided that issue incorrectly.[6]

---

[6] Indeed, the Court of Appeals noted that it had reached a different conclusion when presented with a virtually identical issue in another of its recently decided cases, *Davis* v. *Ichord,* 143 U. S. App. D. C. 183, 442 F. 2d 1207 (1970). The plaintiffs in *Davis* were attacking the constitutionality of the House of Representatives Rule under which the House Committee on Internal Security conducts investigations and maintains files described by the plaintiffs as a "political blacklist." The court noted that any chilling effect to which the plaintiffs were subject arose from the mere existence

In recent years this Court has found in a number of cases that constitutional violations may arise from the deterrent, or "chilling," effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights. *E. g., Baird* v. *State Bar of Arizona,* 401 U. S. 1 (1971); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965); *Baggett* v. *Bullitt,* 377 U. S. 360 (1964). In none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.

For example, the petitioner in *Baird* v. *State Bar of Arizona* had been denied admission to the bar solely because of her refusal to answer a question regarding the organizations with which she had been associated in the past. In announcing the judgment of the Court,

of the Committee and its files and the mere possibility of the misuse of those files. In affirming the dismissal of the complaint, the court concluded that allegations of such a chilling effect could not be elevated to a justiciable claim merely by alleging as well that the challenged House Rule was overly broad and vague.

In deciding the case presently under review, the Court of Appeals distinguished *Davis* on the ground that the difference in the source of the chill in the two cases—a House Committee in *Davis* and the Army in the instant case—was controlling. We cannot agree that the jurisdictional question with which we are here concerned is to be resolved on the basis of the identity of the parties named as defendants in the complaint.

Mr. Justice Black said that "a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." 401 U. S., at 7. Some of the teachers who were the complainants in *Keyishian* v. *Board of Regents* had been discharged from employment by the State, and the others were threatened with such discharge, because of their political acts or associations. The Court concluded that the State's "complicated and intricate scheme" of laws and regulations relating to teacher loyalty could not withstand constitutional scrutiny; it was not permissible to inhibit First Amendment expression by forcing a teacher to "guess what conduct or utterance" might be in violation of that complex regulatory scheme and might thereby "lose him his position." 385 U. S., at 604. *Lamont* v. *Postmaster General* dealt with a governmental regulation requiring private individuals to make a special written request to the Post Office for delivery of each individual mailing of certain kinds of political literature addressed to them. In declaring the regulation invalid, the Court said: "The addressee carries an affirmative obligation which we do not think the Government may impose on him." 381 U. S., at 307. *Baggett* v. *Bullitt* dealt with a requirement that an oath of vague and uncertain meaning be taken as a condition of employment by a governmental agency. The Court said: "Those with a conscientious regard for what they solemnly swear or affirm, sensitive to the perils posed by the oath's indefinite language, avoid the risk of loss of employment, and perhaps profession, only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited." 377 U. S., at 372.

The decisions in these cases fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the

exercise of First Amendment rights. At the same time, however, these decisions have in no way eroded the

> "established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action . . . ." *Ex parte Levitt,* 302 U. S. 633, 634 (1937).

The respondents do not meet this test; their claim, simply stated, is that they disagree with the judgments made by the Executive Branch with respect to the type and amount of information the Army needs and that the very existence of the Army's data-gathering system produces a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights. That alleged "chilling" effect may perhaps be seen as arising from respondents' very perception of the system as inappropriate to the Army's role under our form of government, or as arising from respondents' beliefs that it is inherently dangerous for the military to be concerned with activities in the civilian sector, or as arising from respondents' less generalized yet speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause direct harm to respondents.[7] Allegations of a subjective "chill"

---

[7] Not only have respondents left somewhat unclear the precise connection between the mere existence of the challenged system and their own alleged chill, but they have also cast considerable doubt on whether they themselves are in fact suffering from any such chill. Judge MacKinnon took cogent note of this difficulty in dissenting from the Court of Appeals' judgment, rendered as it was "on the facts of the case which emerge from the pleadings, affidavits and the admissions made to the trial court." 144 U. S. App. D. C., at 84, 444 F. 2d, at 959. At the oral argument before the District Court, counsel for respondents admitted that his clients

are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; "the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *United Public Workers* v. *Mitchell,* 330 U. S. 75, 89 (1947).

Stripped to its essentials, what respondents appear to be seeking is a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination, to probe into the Army's intelligence-gathering activities, with the district court determining at the conclusion of that investigation the extent to which those activities may or may not be appropriate to the Army's mission. The following excerpt from the opinion of the Court of Appeals suggests the broad sweep implicit in its holding:

> "Apparently in the judgment of the civilian head of the Army not everything being done in the operation of this intelligence system was necessary to the performance of the military mission. *If the Secretary of the Army can formulate and implement such judgment based on facts within his De-*

were "not people, obviously, who are cowed and chilled"; indeed, they were quite willing "to open themselves up to public investigation and public scrutiny." But, counsel argued, these respondents must "represent millions of Americans not nearly as forward [and] courageous" as themselves. It was Judge MacKinnon's view that this concession "constitutes a basic denial of practically their whole case." *Ibid.* Even assuming a justiciable controversy, if respondents themselves are not chilled, but seek only to represent those "millions" whom they believe are so chilled, respondents clearly lack that "personal stake in the outcome of the controversy" essential to standing. *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). As the Court recently observed in *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 166, a litigant "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others."

*partmental knowledge, the United States District Court can hear evidence, ascertain the facts, and decide what, if any, further restrictions on the complained-of activities are called for* to confine the military to their legitimate sphere of activity and to protect [respondents'] allegedly infringed constitutional rights." 144 U. S. App. D. C., at 83, 444 F. 2d, at 958. (Emphasis added.)

Carried to its logical end, this approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the "power of the purse"; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action.

We, of course, intimate no view with respect to the propriety or desirability, from a policy standpoint, of the challenged activities of the Department of the Army; our conclusion is a narrow one, namely, that on this record the respondents have not presented a case for resolution by the courts.

The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities—and indeed the claims alleged in the complaint—reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. Indeed, when presented with claims of judicially cognizable in-

jury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE MARSHALL concurs, dissenting.

I

If Congress had passed a law authorizing the armed services to establish surveillance over the civilian population, a most serious constitutional problem would be presented. There is, however, no law authorizing surveillance over civilians, which in this case the Pentagon concededly had undertaken. The question is whether such authority may be implied. One can search the Constitution in vain for any such authority.

The start of the problem is the constitutional distinction between the "militia" and the Armed Forces. By Art. I, § 8, of the Constitution the militia is specifically confined to precise duties: "to execute the Laws of the Union, suppress Insurrections and repel Invasions."

This obviously means that the "militia" cannot be sent overseas to fight wars. It is purely a domestic arm of the governors of the several States,[1] save as it may be called under Art. I, § 8, of the Constitution into the federal service. Whether the "militia" could be

---

[1] I have expressed my doubts whether the "militia" loses its constitutional role by an Act of Congress which incorporates it in the armed services. *Drifka* v. *Brainard,* 89 S. Ct. 434, 21 L. Ed. 2d 427.

given powers comparable to those granted the FBI is a question not now raised, for we deal here not with the "militia" but with "armies." The Army, Navy, and Air Force are comprehended in the constitutional term "armies." Article I, § 8, provides that Congress may "raise and support Armies," and "provide and maintain a Navy," and make "Rules for the Government and Regulation of the land and naval Forces." And the Fifth Amendment excepts from the requirement of a presentment or indictment of a grand jury "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger."

Acting under that authority, Congress has provided a code governing the Armed Services. That code sets the procedural standards for the Government and regulation of the land and naval forces. It is difficult to imagine how those powers can be extended to military surveillance over civilian affairs.[2]

The most pointed and relevant decisions of the Court on the limitation of military authority concern the attempt of the military to try civilians. The first leading case was *Ex parte Milligan,* 4 Wall. 2, 124, where the Court noted that the conflict between "civil liberty" and "martial law" is "irreconcilable." The Court which made that announcement would have been horrified at the prospect of the military—absent a regime of martial law—establishing a regime of surveillance over civilians. The power of the military to establish such a system is obviously less than the power of Congress to authorize such surveillance. For the authority of Congress is restricted by its power to "raise" armies, Art. I, § 8; and, to repeat, its authority over the Armed Forces is stated in these terms, "To make Rules for the Government and Regulation of the land and naval Forces."

---

[2] See Appendix I to this opinion, *infra,* p. 29.

The Constitution contains many provisions guaranteeing rights to persons. Those include the right to indictment by a grand jury and the right to trial by a jury of one's peers. They include the procedural safeguards of the Sixth Amendment in criminal prosecutions; the protection against double jeopardy, cruel and unusual punishments—and, of course, the First Amendment. The alarm was sounded in the Constitutional Convention about the dangers of the armed services. Luther Martin of Maryland said, "when a government wishes to deprive its citizens of freedom, and reduce them to slavery, it generally makes use of a standing army." [3] That danger, we have held, exists not only in bold acts of usurpation of power, but also in gradual encroachments. We held that court-martial jurisdiction cannot be extended to reach any person not a member of the Armed Forces at the times both of the offense and of the trial, which eliminates discharged soldiers. *Toth* v. *Quarles,* 350 U. S. 11. Neither civilian employees of the Armed Forces overseas, *McElroy* v. *Guagliardo,* 361 U. S. 281; *Grisham* v. *Hagan,* 361 U. S. 278, nor civilian dependents of military personnel accompanying them overseas, *Kinsella* v. *Singleton,* 361 U. S. 234; *Reid* v. *Covert,* 354 U. S. 1, may be tried by court-martial. And even as respects those in the Armed Forces we have held that an offense must be "service connected" to be tried by court-martial rather than by a civilian tribunal. *O'Callahan* v. *Parker,* 395 U. S. 258, 272.

The upshot is that the Armed Services—as distinguished from the "militia"—are not regulatory agencies or bureaus that may be created as Congress desires and granted such powers as seem necessary and proper. The authority to provide rules "governing" the Armed Services means the grant of authority to the Armed

---

[3] 3 M. Farrand, Records of the Federal Convention 209 (1911).

Services to govern themselves, not the authority to govern civilians. Even when "martial law" is declared, as it often has been, its appropriateness is subject to judicial review, *Sterling* v. *Constantin,* 287 U. S. 378, 401, 403-404.[4]

Our tradition reflects a desire for civilian supremacy and subordination of military power. The tradition goes back to the Declaration of Independence, in which it was recited that the King "has affected to render the Military independent of and superior to the Civil power." Thus, we have the "militia" restricted to domestic use, the restriction of appropriations to the "armies" to two years, Art. I, § 8, and the grant of command over the armies and the militia when called into actual service of the United States to the President, our chief civilian officer. The tradition of civilian control over the Armed Forces was stated by Chief Justice Warren:[5]

> "The military establishment is, of course, a necessary organ of government; but the reach of its power must be carefully limited lest the delicate balance between freedom and order be upset. The maintenance of the balance is made more difficult by

---

[4] Even some actions of the Armed Services in regulating their own conduct may be properly subjected to judicial scrutiny. Those who are not yet in the Armed Services have the protection of the full panoply of the laws governing admission procedures, see, *e. g., McKart* v. *United States,* 395 U. S. 185; *Oestereich* v. *Selective Service Board,* 393 U. S. 233. Those in the service may use habeas corpus to test the jurisdiction of the Armed Services to try or detain them, see, *e. g., Parisi* v. *Davidson,* 405 U. S. 34; *Noyd* v. *Bond,* 395 U. S. 683, 696 n. 8; *Reid* v. *Covert,* 354 U. S. 1; *Billings* v. *Truesdell,* 321 U. S. 542. And, those in the Armed Services may seek the protection of civilian, rather than military, courts when charged with crimes not service connected, *O'Callahan* v. *Parker,* 395 U. S. 258.

[5] The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 182, 193 (1962).

the fact that while the military serves the vital function of preserving the existence of the nation, it is, at the same time, the one element of government that exercises a type of authority not easily assimilated in a free society. . . .

. . . . .

"In times of peace, the factors leading to an extraordinary deference to claims of military necessity have naturally not been as weighty. This has been true even in the all too imperfect peace that has been our lot for the past fifteen years—and quite rightly so, in my judgment. It is instructive to recall that our Nation at the time of the Constitutional Convention was also faced with formidable problems. The English, the French, the Spanish, and various tribes of hostile Indians were all ready and eager to subvert or occupy the fledgling Republic. Nevertheless, in that environment, our Founding Fathers conceived a Constitution and Bill of Rights replete with provisions indicating their determination to protect human rights. There was no call for a garrison state in those times of precarious peace. We should heed no such call now. If we were to fail in these days to enforce the freedom that until now has been the American citizen's birthright, we would be abandoning for the foreseeable future the constitutional balance of powers and rights in whose name we arm."

Thus, we have until today consistently adhered to the belief that

"[i]t is an unbending rule of law, that the exercise of military power, where the rights of the citizen are concerned, shall never be pushed beyond what the exigency requires." *Raymond* v. *Thomas,* 91 U. S. 712, 716.

It was in that tradition that *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, was decided, in which President Truman's seizure of the steel mills in the so-called Korean War was held unconstitutional. As stated by Justice Black:

"The order cannot properly be sustained as an exercise of the President's military power as Commander in Chief of the Armed Forces. The Government attempts to do so by citing a number of cases upholding broad powers in military commanders engaged in day-to-day fighting in a theater of war. Such cases need not concern us here. Even though 'theater of war' be an expanding concept, we cannot with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production. This is a job for the Nation's lawmakers, not for its military authorities." *Id.,* at 587.

Madison expressed the fear of military dominance: [6]

"The veteran legions of Rome were an overmatch for the undisciplined valor of all other nations, and rendered her the mistress of the world.

"Not the less true is it, that the liberties of Rome proved the final victim to her military triumphs; and that the liberties of Europe, as far as they ever existed, have, with few exceptions, been the price of her military establishments. A standing force, therefore, is a dangerous, at the same time that it may be a necessary, provision. On the smallest scale it has its inconveniences. On an extensive

---

[6] The Federalist No. 41.

scale its consequences may be fatal. On any scale it is an object of laudable circumspection and precaution. A wise nation will combine all these considerations; and, whilst it does not rashly preclude itself from any resource which may become essential to its safety, will exert all its prudence in diminishing both the necessity and the danger of resorting to one which may be inauspicious to its liberties.

"The clearest marks of this prudence are stamped on the proposed Constitution. The Union itself, which it cements and secures, destroys every pretext for a military establishment which could be dangerous. America united, with a handful of troops, or without a single soldier, exhibits a more forbidding posture to foreign ambition than America disunited, with a hundred thousand veterans ready for combat."

As Chief Justice Warren has observed, the safeguards in the main body of the Constitution did not satisfy the people on their fear and concern of military dominance:[7]

"They were reluctant to ratify the Constitution without further assurances, and thus we find in the Bill of Rights Amendments 2 and 3, specifically authorizing a decentralized militia, guaranteeing the right of the people to keep and bear arms, and prohibiting the quartering of troops in any house in time of peace without the consent of the owner. Other Amendments guarantee the right of the people to assemble, to be secure in their homes against unreasonable searches and seizures, and in criminal cases to be accorded a speedy and public trial by an impartial jury after indictment in the district

[7] N. 5, *supra,* at 185.

and state wherein the crime was committed. The only exceptions made to these civilian trial procedures are for cases arising in the land and naval forces. Although there is undoubtedly room for argument based on the frequently conflicting sources of history, it is not unreasonable to believe that our Founders' determination to guarantee the pre-eminence of civil over military power was an important element that prompted adoption of the Constitutional Amendments we call the Bill of Rights."

The action in turning the "armies" loose on surveillance of civilians was a gross repudiation of our traditions. The military, though important to us, is subservient and restricted purely to military missions. It even took an Act of Congress to allow a member of the Joint Chiefs of Staff to address the Congress; [8] and that small step did not go unnoticed but was in fact viewed with alarm by those respectful of the civilian tradition. Walter Lippmann has written that during World War II, he was asked to convey a message to Winston Churchill, while the latter was in Washington together with his chiefs of staff. It was desired that Churchill should permit his chiefs of staff to testify before Congress as to the proper strategy for waging the war. Lippmann explains, however, that he "never finished the message. For the old lion let out a roar

---

[8] The National Security Act of 1947, amended by § 5 of the Act of Aug. 10, 1949, 63 Stat. 580, provided in § 202 (c) (6):

"No provision of this Act shall be so construed as to prevent a Secretary of a military department or a member of the Joint Chiefs of Staff from presenting to the Congress, on his own initiative, after first so informing the Secretary of Defense, any recommendation relating to the Department of Defense that he may deem proper." See H. R. Conf. Rep. No. 1142, 81st Cong., 1st Sess., 18. This provision is now codified as 10 U. S. C. § 141 (e).

24

demanding to know why I was so ignorant of the British way of doing things that I could dare to suggest that a British general should address a parliamentary body.

"As I remember it, what he said was 'I am the Minister of Defense and I, not the generals, will state the policy of His Majesty's government.'" The Intervention of the General, Washington Post, Apr. 27, 1967, Sec. A, p. 21, col. 1.[9]

The act of turning the military loose on civilians even if sanctioned by an Act of Congress, which it has not been, would raise serious and profound constitutional questions. Standing as it does only on brute power and Pentagon policy, it must be repudiated as a usurpation dangerous to the civil liberties on which free men are dependent. For, as Senator Sam Ervin has said, "this claim of an inherent executive branch power of investigation and surveillance on the basis of people's beliefs and attitudes may be more of a threat to our internal security than any enemies beyond our borders." Privacy and Government Investigations, 1971 U. Ill. L. F. 137, 153.

## II

The claim that respondents have no standing to challenge the Army's surveillance of them and the other members of the class they seek to represent is too transparent for serious argument. The surveillance of the Army over the civilian sector—a part of society hitherto immune from its control—is a serious charge. It is alleged that the Army maintains files on the membership, ideology, programs, and practices of virtually every activist political group in the country, including groups such as the Southern Christian Leadership Conference, Clergy

---

[9] The full account is contained in Appendix II, *infra*, at 33.

and Laymen United Against the War in Vietnam, the American Civil Liberties Union, Women's Strike for Peace, and the National Association for the Advancement of Colored People. The Army uses undercover agents to infiltrate these civilian groups and to reach into confidential files of students and other groups. The Army moves as a secret group among civilian audiences, using cameras and electronic ears for surveillance. The data it collects are distributed to civilian officials in state, federal, and local governments and to each military intelligence unit and troop command under the Army's jurisdiction (both here and abroad); and these data are stored in one or more data banks.

Those are the allegations; and the charge is that the purpose and effect of the system of surveillance is to harass and intimidate the respondents and to deter them from exercising their rights of political expression, protest, and dissent "by invading their privacy, damaging their reputations, adversely affecting their employment and their opportunities for employment, and in other ways." Their fear is that "permanent reports of their activities will be maintained in the Army's data bank, and their 'profiles' will appear in the so-called 'Blacklist' and that all of this information will be released to numerous federal and state agencies upon request."

Judge Wilkey, speaking for the Court of Appeals, properly inferred that this Army surveillance "exercises a *present inhibiting effect* on their full expression and utilization of their First Amendment rights." 144 U. S. App. D. C. 72, 79, 444 F. 2d 947, 954. That is the test. The "deterrent effect" on First Amendment rights by government oversight marks an unconstitutional intrusion, *Lamont* v. *Postmaster General*, 381 U. S. 301, 307. Or, as stated by MR. JUSTICE BRENNAN, "inhibition as well as prohibition against the exercise of precious First

Amendment rights is a power denied to government."
*Id.,* at 309. When refusal of the Court to pass on the
constitutionality of an Act under the normal considera-
tion of forbearance "would itself have an inhibitory effect
on freedom of speech" then the Court will act. *United
States* v. *Raines,* 362 U. S. 17, 22.

As stated by the Supreme Court of New Jersey, "there
is good reason to permit the strong to speak for the weak
or the timid in First Amendment matters." *Anderson*
v. *Sills,* 56 N. J. 210, 220, 265 A. 2d 678, 684 (1970).

One need not wait to sue until he loses his job or until
his reputation is defamed. To withhold standing to sue
until that time arrives would in practical effect immunize
from judicial scrutiny all surveillance activities, regard-
less of their misuse and their deterrent effect. As stated
in *Flast* v. *Cohen,* 392 U. S. 83, 101, "in terms of
Article III limitations on federal court jurisdiction, the
question of standing is related only to whether the dis-
pute sought to be adjudicated will be presented in an
adversary context and in a form historically viewed as
capable of judicial resolution." Or, as we put it in *Baker*
v. *Carr,* 369 U. S. 186, 204, the gist of the standing issue
is whether the party seeking relief has "alleged such a
personal stake in the outcome of the controversy as to
assure that concrete adverseness which sharpens the pres-
entation of issues upon which the court so largely
depends for illumination of difficult constitutional
questions."

The present controversy is not a remote, imaginary
conflict. Respondents were targets of the Army's sur-
veillance. First, the surveillance was not casual but
massive and comprehensive. Second, the intelligence
reports were regularly and widely circulated and were
exchanged with reports of the FBI, state and municipal
police departments, and the CIA. Third, the Army's

surveillance was not collecting material in public records but staking out teams of agents, infiltrating undercover agents, creating command posts inside meetings, posing as press photographers and newsmen, posing as TV newsmen, posing as students, and shadowing public figures.

Finally, we know from the hearings conducted by Senator Ervin that the Army has misused or abused its reporting functions. Thus, Senator Ervin concluded that reports of the Army have been "taken from the Intelligence Command's highly inaccurate civil disturbance teletype and filed in Army dossiers on persons who have held, or were being considered for, security clearances, thus contaminating what are supposed to be investigative reports with unverified gossip and rumor. This practice directly jeopardized the employment and employment opportunities of persons seeking sensitive positions with the federal government or defense industry." [10]

Surveillance of civilians is none of the Army's constitutional business and Congress has not undertaken to entrust it with any such function. The fact that since this litigation started the Army's surveillance may have been cut back is not an end of the matter. Whether there has been an actual cutback or whether the announcements are merely a ruse can be determined only after a hearing in the District Court. We are advised by an *amicus curiae* brief filed by a group of former Army Intelligence Agents that Army surveillance of civilians is rooted in secret programs of long standing:

"Army intelligence has been maintaining an unauthorized watch over civilian political activity for nearly 30 years. Nor is this the first time that

[10] Hearings on Federal Data Banks, Computers and the Bill of Rights, before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 92d Cong., 1st Sess. (1971).

Army intelligence has, without notice to its civilian superiors, overstepped its mission. From 1917 to 1924, the Corps of Intelligence Police maintained a massive surveillance of civilian political activity which involved the use of hundreds of civilian informants, the infiltration of civilian organizations and the seizure of dissenters and unionists, sometimes without charges. That activity was opposed—then as now—by civilian officials on those occasions when they found out about it, but it continued unabated until post-war disarmament and economies finally eliminated the bureaucracy that conducted it." Pp. 29–30.

This case involves a cancer in our body politic. It is a measure of the disease which afflicts us. Army surveillance, like Army regimentation, is at war with the principles of the First Amendment. Those who already walk submissively will say there is no cause for alarm. But submissiveness is not our heritage. The First Amendment was designed to allow rebellion to remain as our heritage. The Constitution was designed to keep government off the backs of the people. The Bill of Rights was added to keep the precincts of belief and expression, of the press, of political and social activities free from surveillance. The Bill of Rights was designed to keep agents of government and official eavesdroppers away from assemblies of people. The aim was to allow men to be free and independent and to assert their rights against government. There can be no influence more paralyzing of that objective than Army surveillance. When an intelligence officer looks over every nonconformist's shoulder in the library, or walks invisibly by his side in a picket line, or infiltrates his club, the America once extolled as the voice of liberty heard around the world no longer is

cast in the image which Jefferson and Madison designed, but more in the Russian image, depicted in Appendix III to this opinion.

### APPENDIX I TO OPINION OF DOUGLAS, J., DISSENTING

The narrowly circumscribed domestic role which Congress has by statute authorized the Army to play is clearly an insufficient basis for the wholesale civilian surveillance of which respondents complain. The entire domestic mission of the armed services is delimited by nine statutes.

*Four define the Army's narrow role as a back-up for civilian authority where the latter has proved insufficient to cope with insurrection:*

10 U. S. C. § 331:

"Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection."

10 U. S. C. § 332:

"Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State or Territory by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion."

10 U. S. C. § 333:

"The President, by using the militia or the armed forces, or both, or by any other means, shall take such measures as he considers necessary to suppress, in a State, any insurrection, domestic violence, unlawful combination, or conspiracy, if it—

"(1) so hinders the execution of the laws of that State, and of the United States within the State, that any part or class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law, and the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection; or

"(2) opposes or obstructs the execution of the laws of the United States or impedes the course of justice under those laws.

"In any situation covered by clause (1), the State shall be considered to have denied the equal protection of the laws secured by the Constitution."

10 U. S. C. § 334:

"Whenever the President considers it necessary to use the militia or the armed forces under this chapter, he shall, by proclamation, immediately order the insurgents to disperse and retire peaceably to their abodes within a limited time."

*Two statutes, passed as a result of Reconstruction Era military abuses, prohibit military interference in civilian elections:*

18 U. S. C. § 592:

"Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the

United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

"This section shall not prevent any officer or member of the armed forces of the United States from exercising the right of suffrage in any election district to which he may belong, if otherwise qualified according to the laws of the State in which he offers to vote."

18 U. S. C. § 593:

"Whoever, being an officer or member of the Armed Forces of the United States, prescribes or fixes or attempts to prescribe or fix, whether by proclamation, order or otherwise, the qualifications of voters at any election in any State; or

"Whoever, being such officer or member, prevents or attempts to prevent by force, threat, intimidation, advice or otherwise any qualified voter of any State from fully exercising the right of suffrage at any general or special election; or

"Whoever, being such officer or member, orders or compels or attempts to compel any election officer in any State to receive a vote from a person not legally qualified to vote; or

"Whoever, being such officer or member, imposes or attempts to impose any regulations for conducting any general or special election in a State, different from those prescribed by law; or

"Whoever, being such officer or member, interferes in any manner with an election officer's discharge of his duties—

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both; and disqualified from holding any office of honor, profit or trust under the United States.

"This section shall not prevent any officer or member of the Armed Forces from exercising the right of suffrage in any district to which he may belong, if otherwise qualified according to the laws of the State of such district."

*Another Reconstruction Era statute forbids the use of military troops as a posse comitatus:*

18 U. S. C. § 1385:

"Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both."

*Finally, there are two specialized statutes. It was thought necessary to pass an Act of Congress to give the armed services some limited power to control prostitution near military bases, and an Act of Congress was required to enable a member of the Joint Chiefs of Staff to testify before Congress:*

18 U. S. C. § 1384:

"Within such reasonable distance of any military or naval camp, station, fort, post, yard, base, cantonment, training or mobilization place as the Secretary of the Army, the Secretary of the Navy, the Secretary of the Air Force, or any two or all of them shall determine to be needful to the efficiency, health, and welfare of the Army, the Navy, or the Air Force, and shall designate and publish in general orders or bulletins, whoever engages in prostitution or aids or abets prostitution or procures or solicits for purposes of prostitution, or keeps or sets up a house of ill fame, brothel, or bawdy house, or receives any person for purposes of lewdness, assignation, or prostitution into any vehicle, conveyance, place, structure, or building, or permits any person to remain for

the purpose of lewdness, assignation, or prostitution in any vehicle, conveyance, place, structure, or building or leases or rents or contracts to lease or rent any vehicle, conveyance, place, structure or building, or part thereof, knowing or with good reason to know that it is intended to be used for any of the purposes herein prohibited shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"The Secretaries of the Army, Navy, and Air Force and the Federal Security Administrator shall take such steps as they deem necessary to suppress and prevent such violations thereof, and shall accept the cooperation of the authorities of States and their counties, districts, and other political subdivisions in carrying out the purpose of this section.

"This section shall not be construed as conferring on the personnel of the Departments of the Army, Navy, or Air Force or the Federal Security Agency any authority to make criminal investigations, searches, seizures, or arrests of civilians charged with violations of this section."

10 U. S. C. § 141 (e):

"After first informing the Secretary of Defense, a member of the Joint Chiefs of Staff may make such recommendations to Congress relating to the Department of Defense as he may consider appropriate."

APPENDIX II TO OPINION OF DOUGLAS, J.,
DISSENTING

Walter Lippmann gave the following account of his conversation with Churchill:

"The President's bringing Gen. Westmoreland home in order to explain the war reminds me of an instructive afternoon spent during the Second World War. The country and the Congress were divided on the question of whether to strike first against

Hitler or first against Japan. Churchill and Roosevelt had agreed on the policy of Hitler first. But there were large and powerful groups in the country, many of them former isolationists in the sense that they were anti-European, who wanted to concentrate American forces on winning the war against Japan. Even the American chiefs of staff were divided on this question of high strategy.

"Churchill had come to Washington, accompanied by the British chiefs of staff, to work out with President Roosevelt and the Administration the general plan of the global war. One morning I had a telephone call from Sen. Austin, who was a strong believer in the Churchill-Roosevelt line. He said in effect, 'I know you are seeing the Prime Minister this afternoon and I wish you would ask him to tell his chiefs of staff to come to Congress and testify in favor of our strategical policy.' Quite innocently I said I would do this, and when Churchill received me that afternoon I began by saying that I had a message from Sen. Austin. 'Would the Prime Minister instruct his chiefs of staff to go to the Senate Foreign Relations Committee . . . .' I never finished the message. For the old lion let out a roar demanding to know why I was so ignorant of the British way of doing things that I could dare to suggest that a British general should address a parliamentary body.

"As I remember it, what he said was, 'I am the Minister of Defense and I, not the generals, will state the policy of His Majesty's government.'

"No one who ever aroused the wrath of Churchill is likely to forget it. I certainly have not forgotten it. I learned an indelible lesson about one of the elementary principles of democratic government. And therefore, I take a very sour view of a field

commander being brought home by the President to educate the Congress and the American people."

Our military added political departments to their staffs. A Deputy Chief of Naval Operations, Military Policy Division, was first established in the Department of the Navy by President Truman in 1945. In the Office of Secretary of Defense that was done by President Truman in 1947, the appointee eventually becoming Assistant Secretary for International Security Affairs. A like office was established in 1961 in the Department of the Army by President Kennedy and another for the Air Force in 1957 by President Eisenhower. Thus, when the Pentagon entered a Washington, D. C., conference, its four "Secretaries of State" faced the real Secretary of State and more frequently than not talked or stared him down. The Pentagon's "Secretaries of State" usually spoke in unison; they were clear and decisive with no ifs, ands, or buts, and in policy conferences usually carried the day.

By 1968 the Pentagon was spending $34 million a year on non-military social and behavioral science research both at home and abroad. One related to "witchcraft, sorcery, magic, and other psychological phenomena" in the Congo. Another concerned the "political influence of university students in Latin America." Other projects related to the skill of Korean women as divers, snake venoms in the Middle East, and the like. Research projects were going on for the Pentagon in 40 countries in sociology, psychology and behavioral sciences.

The Pentagon became so powerful that no President would dare crack down on it and try to regulate it.

The military approach to world affairs conditioned our thinking and our planning after World War II.

We did not realize that to millions of these people there was no difference between a Communist dictatorship

and the dictatorship under which they presently lived. We did not realize that in some regions of Asia it was the Communist party that identified itself with the so-called reform programs, the other parties being mere instruments for keeping a ruling class in power. We did not realize that, in the eyes of millions of illiterates, the choice between democracy and communism was not the critical choice it would be for us.

We talked about "saving democracy." But the real question in Asia, the Middle East, Africa, and Latin America was whether democracy would ever be born.

We forgot that democracy in most lands is an empty word. We asked illiterate people living at the subsistence level to furnish staging grounds for a military operation whose outcome, in their eyes, had no relation to their own welfare. Those who rejected our overtures must be communists, we said. Those who did not approve our military plans must be secretly aligning with Russia, we thought.

So it was that in underdeveloped areas we became identified not with ideas of freedom, but with bombs, planes, and tanks. We thought less and less in terms of defeating communism with programs of political action, more and more in terms of defeating communism with military might. Our foreign aid mounted; but nearly 70% of it was military aid.

Our fears mounted as the cold war increased in intensity. These fears had many manifestations. The communist threat inside the country was magnified and exalted far beyond its realities. Irresponsible talk fanned the flames. Accusations were loosely made. Character assassinations were common. Suspicion took the place of goodwill. We needed to debate with impunity and explore to the edges of problems. We needed to search to the horizon for answers to perplexing problems. We needed confidence in each other. But in the

40's, 50's, and 60's suspicions grew. Innocent acts became telltale marks of disloyalty. The coincidence that an idea paralleled Soviet Russia's policy for a moment of time settled an aura of doubt around a person. The Intervention of the General, Washington Post, Apr. 27, 1967, Sec. A, p. 21, col. 1.

## APPENDIX III TO OPINION OF DOUGLAS, J., DISSENTING

Alexander I. Solzhenitsyn, the noted Soviet author, made the following statement March 30, 1972, concerning surveillance of him and his family (reported in the Washington Post, Apr. 3, 1972):

"A kind of forbidden, contaminated zone has been created around my family, and to this day, there are people in Ryazan [where Solzhenitsyn used to live] who were dismissed from their jobs for having visited my house a few years ago. A corresponding member of the Academy of Sciences, T. Timofeyev, who is director of a Moscow institute, became so scared when he found out that a mathematician working under him was my wife that he dismissed her with unseemly haste, although this was just after she had given birth and contrary to all laws . . .

"It happens that an informant [for his new book on the history of prerevolutionary Russia] may meet with me. We work an hour or two and as soon as he leaves my house, he will be closely followed, as if he were a state criminal, and they will investigate his background, and then go on to find out who this man meets, and then, in turn, who that [next] person is meeting.

"Of course they cannot do this with everyone. The state security people have their schedule, and their own profound reasoning. On some days, there is no surveillance at all, or only superficial surveillance. On other days, they hang around, for example when Heinrich Boll

came to see me [he is a German writer who recently visited Moscow]. They will put a car in front of each of the two approaches [to the courtyard of the apartment house where he stays in Moscow] with three men in each car—and they don't work only one shift. Then off they go after my visitors, or they trail people who leave on foot.

"And if you consider that they listen around the clock to telephone conversations and conversations in my home, they analyze recording tapes and all correspondence, and then collect and compare all these data in some vast premises—and these people are not underlings—you cannot but be amazed that so many idlers in the prime of life and strength, who could be better occupied with productive work for the benefit of the fatherland, are busy with my friends and me, and keep inventing enemies."

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

The Court of Appeals held that a justiciable controversy exists and that respondents have stated a claim upon which relief could be granted. 144 U. S. App. D. C. 72, 83, 444 F. 2d 947, 958 (1971). I agree with Judge Wilkey, writing for the Court of Appeals, that this conclusion is compelled for the following reasons stated by him:

> "[Respondents] contend that the *present existence of this system* of gathering and distributing information, allegedly far beyond the mission requirements of the Army, constitutes an impermissible burden on [respondents] and other persons similarly situated which exercises a *present inhibiting effect* on their full expression and utilization of their First Amendment rights of free speech, etc. The baleful effect, if there is one, is thus a present

inhibition of lawful behavior and of First Amendment rights.

"Under this view of [respondents'] allegations, under justiciability standards it is the operation of the system itself which is the breach of the Army's duty toward [respondents] and other civilians. The case is therefore ripe for adjudication. Because the evil alleged in the Army intelligence system is that of overbreadth, *i. e.,* the collection of information not reasonably relevant to the Army's mission to suppress civil disorder, and because there is no indication that a better opportunity will later arise to test the constitutionality of the Army's action, the issue can be considered justiciable at this time." *Id.,* at 79–81, 444 F. 2d, at 954–956 (emphasis in original) (footnotes omitted).

"To the extent that the Army's argument against justiciability here includes the claim that [respondents] lack standing to bring this action, we cannot agree. If the Army's system does indeed derogate First Amendment values, the [respondents] are persons who are sufficiently affected to permit their complaint to be heard. The record shows that most if not all of the [respondents] and/or the organizations of which they are members have been the subject of Army surveillance reports and their names have appeared in the Army's records. Since this is precisely the injury of which [respondents] complain, they have standing to seek redress for that alleged injury in court and will provide the necessary adversary interest that is required by the standing doctrine, on the issue of whether the actions complained of do in fact inhibit the exercise of First Amendment rights. Nor should the fact that

these particular persons are sufficiently uninhibited to bring this suit be any ground for objecting to their standing." *Id.*, at 79 n. 17, 444 F. 2d, at 954 n. 17.

Respondents may or may not be able to prove the case they allege. But I agree with the Court of Appeals that they are entitled to try. I would therefore affirm the remand to the District Court for a trial and determination of the issues specified by the Court of Appeals.