NATIONAL ASSOCIATION OF RECY-CLING INDUSTRIES, INC., Plaintiff,

v.

SECRETARY OF COMMERCE, Defendant.

Civil Action No. 79–3324.

United States District Court, District of Columbia.

July 3, 1980.

Edward L. Merrigan, Washington, D. C., for plaintiff.

Daniel J. Metcalfe, U. S. Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the court on the defendant's motion to dismiss or, in the alternative, for summary judgment and on the plaintiff's cross-motion for summary judgment. The plaintiff National Association of Recycling Industries, Inc. (NARI), a trade association of approximately 1100 firms engaged in collecting, processing, and marketing recyclable metals, paper, textiles, and rubber, sues the Secretary of Commerce (Secretary) in connection with the latter's authority for administering section 7(c) of the Export Administration Act of 1979 (Act), 50 App.U.S.C. § 2406(c). NARI challenges the constitutionality of section 7(c), alleging that it denies NARI's members due process and equal protection under the Fifth Amendment. The Secretary moves for summary judgment or dismissal on the grounds that the plaintiff lacks standing to bring this suit and that in any event section 7(c) is constitutionally sound.

The court agrees with the defendant in both respects and will therefore grant the motion.

*Discussion*

### A. Background

Section 7(c) provides in pertinent part:

Any entity . . . which is representative of an industry . . . which processes metallic materials capable of being recycled with respect to which an increase in domestic prices or a domestic shortage, either of which results from increased exports, has or may have a significant adverse effect on the national economy or any sector thereof, may transmit a written petition to the Secretary requesting the monitoring of exports, or the imposition of export controls, or both . . . . .

It should be noted at the outset that neither this section nor other pertinent sections of the Act alter the substantive powers of the Secretary. Continuously since 1949, and for limited periods before then, the Secretary has held statutory authority to restrict exports from the United States where necessary in the interests of foreign policy, national security, or the preservation of goods in short supply. Section 7(c) establishes a procedural mechanism allowing interested parties to petition the Secretary for imposition of monitoring or controls or both. It requires all petitions to include "any infor-

mation reasonably available to the petitioner indicating (i) that there has been a significant increase . . . in exports of such material . . . and (ii) that there has been a significant increase in the price of such material or a domestic shortage . . . under circumstances indicating the price increase or domestic shortage may be related to exports." It also provides that upon request of the petitioner "the Secretary shall conduct public hearings with respect to the subject of the petition" and thereafter determine what action to take, if any.

## B. *Standing*

 A dispute does not fall within the subject-matter jurisdiction of federal courts unless it qualifies as a "case" or "controversy" within the meaning of article III, and it cannot so qualify unless the plaintiff has suffered "injury in fact."[1] *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 2931, 41 L.Ed.2d 706 (1974); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Harm alleged by a plaintiff must be "specific," *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), and it must be "fairly traceable to the defendant's acts or omissions," *Village of Arlington Heights v. Metro Housing Division*, 429 U.S. 252, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).

Here the harm on which the plaintiff relies consists primarily of market disruption that allegedly has resulted and will continue to result in the metallic recyclables industry from the petitioning process estab-lished by section 7(c). According to NARI, the problem is tied to the perceptions of foreign investors and their potential for responding chaotically to the petitioning process. Specifically, NARI is concerned about scare-buying and similar phenomena yielding drastic market fluctuations that adversely affect the industry. It says that such phenomena can occur, and indeed have occurred, in response to mere publicity regarding anticipated filings of petitions pursuant to section 7(c).

Additionally, NARI contends that the costs of attending and mounting an effective opposition at the hearings mandated by section 7(c) constitute injury in fact for purposes of standing. In April and May, 1980, for example, its counsel travelled to four separate locations—Washington, San Francisco, New Orleans, and Chicago—in connection with the first hearings held pursuant to section 7(c).[2]

 This court is not persuaded that NARI has satisfied the requirement of showing injury in fact. All its alleged injuries appear conjectural, to say the least. The mere possibility that the filing of a petition might stimulate foreign speculation leading to panic-induced market dislocations resulting in economic injury to NARI's members is too remote an injury to support jurisdiction; the chain of causation is too tenuous. NARI emphasizes that the market fluctuations in March and April of this year have already shown the chaos to which any qualifying entity can subject the

1. *Cf.* L. Tribe, *American Constitutional Law* 80 (1978) (suggesting that the basis of the injury-in-fact aspect of the doctrine of standing may lie not in the "cases and controversies" limitation of article III but elsewhere.)

2. NARI also appears to argue that there is harm sufficient to confer standing in the threat of actual substantive controls, as distinguished from the market chaos arising from mere petitions or anticipated petitions for such controls. Aside from the fact that neither monitoring nor controls have yet been imposed under the Act, this argument shifts the focus of the plaintiff's attack from the procedural mechanism established by section 7(c) to the substantive author-ity conferred by the Act as a whole. As indicated above, section 7(c) does not alter the substantive authority of the Secretary. Therefore, in order to challenge that authority NARI must challenge the entire Act. There is no indication that the scope of NARI's challenge is so broad, however, and in any event such a challenge could not succeed. Except with respect to section 7(c), the Act does not single out recyclables for special treatment, so an equal protection attack would clearly fail. And in view of the manifestly rational bases for authority to restrict exports a due process challenge would fare no better.

recycling industry,[3] but it has failed to show more than a speculative relationship between the petition-and-hearing process and these export movements. By affidavit, Mr. Converse Hettinger, the Director of the Short Supply Division, Office of Export Administration, Department of Commerce, stated, "It is virtually impossible at this time to predict accurately the effect which the operation of this new petition procedure may have on the ferrous scrap market." ¶ 14. This court is simply not persuaded that Mr. Hettinger is wrong.

Similarly inadequate are the legal costs to NARI of representation at whatever hearings might be held pursuant to section 7(c). Attendance at such hearings is purely voluntary, and neither monitoring nor controls have ever been imposed subsequent to such hearings.

For these reasons, NARI lacks standing to sue,[4] and this court therefore lacks subject matter jurisdiction over the action.

### C. *The Merits*

The precise legal basis of NARI's position on the merits is unclear, but because the government expressly chose to "test the claim solely as one of denial of equal protection," Defendant's Motion 17, and NARI nowhere challenged this treatment, this court will assume that the plaintiff's position is grounded on the equal protection clause of the Fifth Amendment.[5] The question, then, is whether section 7(c), by singling out recyclable metals for distinct treatment via the petition-and-hearing procedure, has denied NARI equal protection of the law.

■ Absent infringement of a "fundamental right" or utilization of a "suspect classification," "legislative classifications are valid unless they bear no rational relationship to the State's objectives." *Washington v. Confederated Bands and Tribes*, 439 U.S. 463, 99 S.Ct. 740, 762, 58 L.Ed.2d 740 (1979). *See* L. Tribe, *supra* at 1000 ("[T]he Supreme Court has continued to invoke the pragmatic need for judicial deference to legislative action, especially in the sphere of zoning, taxation, and economic distribution or regulation, and has there continued to apply the traditional techniques of minimum-rationality analysis.") Thus, enactments like section 7(c) merit only minimal judicial scrutiny.

Applying rational-basis analysis, the government argues that the section 7(c) procedure is justified by the particular public interest in recyclables generally and in recyclable metals in particular. Historically, it says, the recyclable metals industry has been unusually volatile, and the legislative history of section 7(c) shows that this industry has been a frequent object of congressional concern. As additional justification for section 7(c)'s distinct treatment of recyclable metals, the defendant argues that Congress has a legitimate right to experiment with such a procedure on a limited

---

**3.** Ferrous scrap exports rose approximately 17% in March, 1980—in response, according to NARI, to an announced but as yet unfiled petition for monitoring controls. In April, 1980 these exports dropped almost 29%—in response, according to NARI, to the Commerce Department's announcement that it would issue no decision on the pending petitions until July, 1980.

**4.** In its response to the government's standing challenge, NARI devotes considerable discussion to the standing of associations like itself to assert the rights of their members. This misconceives the standing issue altogether. No one in this suit challenges NARI's standing to protest demonstrable injuries to its members. Rather, the question here is whether those members actually have suffered or are likely to suffer such injuries.

**5.** The only apparent alternative is a substantive due process challenge, and as the government indicates, the "plaintiff's reference to 'due process' appears to be only a mechanism for asserting its 'equal protection' claim." Defendant's Motion 16. In any event, as economic/regulatory legislation, the Act in general and section 7(c) in particular appear sufficiently reasonable—in both their means and their objectives—to withstand scrutiny in terms of substantive due process requirements. *See* L. Tribe, *supra* at 450 (1978) (indicating that the Supreme Court will "sustain regulation in the socioeconomic sphere if any state of facts either known or reasonably inferrable afforded support for the legislative judgment.")

number—in this instance, one—of commodities, and in view of the distinct characteristics or recyclable metals, it was certainly rational for Congress to select them for experimental purposes.

NARI argues that in fact no rational basis exists for imposing such a procedure, with such deleterious impact, on the recyclable metals industry. It contends that the true explanation for its distinct treatment —indeed, the only explanation—is the steel industry's economic interest in impairing competition from recyclables. According to NARI, representatives of the steel industry successfully lobbied key congressional figures to remove the steel industry from the scope of section 7(c) but to keep recyclables within it, and the invidiously disparate results of their efforts cannot withstand constitutional scrutiny.

■ The court cannot accept NARI's argument. To do so would require it to speculate as to the motivations of the members of Congress—a manifestly improper intrusion into the political process. The function of the judicial branch in this context is not to second-guess the Congress but to enforce the requirements of the Constitution. Here such enforcement consists of determining whether the plaintiff has shown disparate legislative treatment without a rational basis. In view of the aforementioned possible bases for section 7(c), all thoroughly rational, and because in the past Congress has repeatedly singled out individual commodities for special treatment warranted by special market conditions or other considerations, the court cannot hold that the plaintiff has made the necessary showing.

For all the foregoing reasons, the defendant's motion for summary judgment must be granted.

