LIFE SCIENCE CHURCH, an unincorporated association; Frank A. Jania; Vincent Victor Kowski; Anthony Carillo; William W. Schwartz; Joan Patterson Garcia, individually and on behalf of all others similarly situated, Plaintiffs,

v.

INTERNAL REVENUE SERVICE; Michael Sassi, Defendants.

No. C–81–1418.

United States District Court, N. D. California.

Oct. 21, 1981.

Peter R. Stromer, San Jose, Cal., for plaintiffs.

Jeffrey S. Niesen, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## OPINION AND ORDER

AGUILAR, District Judge.

The essence of plaintiffs' action is that the officers and employees of the Treasury Department have been overly zealous in carrying out their Congressional authorization to "inquire after persons who may be liable to pay any internal revenue tax," to the point of violating plaintiffs' rights. *See* 26 U.S.C. § 7601(a).

Plaintiffs in this action are the Life Science Church (hereinafter referred to as "the Church") and five individuals who are ministers of the Life Science Church and members of the Order of the Almighty God (hereinafter referred to as "the Order"). The Order is alleged to be an integral part of the Life Science Church organization. Plaintiffs sue on behalf of themselves and on behalf of all ministers of the Church and members of the Order.

The Church is an unincorporated association allegedly organized and operated exclusively for religious purposes. The Church was founded in 1967 by Mr. William Drexler, now the Most Reverend William Drexler, the ecclesiastical superior of the Church. The Church is founded on the beliefs contained in the Church Bible, the Declaration of Independence, the Sacred Scripture, and the sacred natural law, "Do unto others as you would have them do unto you."

The Church operates almost exclusively by means of the mails. Individuals obtain ministries of the Church and memberships in the Order by mail. Upon payment of the ministry fee, the Most Reverend Drexler issues to the new minister a certificate which sets forth the duties of a minister of the Church and assigns him a Church chapter. The certificate states in part that the minister is to use his current occupation "as a vehicle and instrument to carry out and put into effect the principles of the Church" and directs the minister "to keep employment and work in order to earn income to use to support yourself and your family as a vehicle to carry out the purpose of the Church."

Most, if not all, of the ministers also become members of the Order of Almighty God. To become a member of the Order, each minister executes a Vow of Poverty. By this vow the individual makes an irrevocable gift of all real and personal possessions to that chapter of the Order of which he himself is the minister. The Vow of Poverty similarly assigns all future employment remuneration of the minister to the named chapter of the Order.

In addition to the alleged theological and social aspects of the Church's work, there are certain claimed tax benefits to the ministry and Order. By assigning all present and future income to a chapter of the Order through the Vow of Poverty, Church ministers contend that they receive no income as individuals. In this regard, ministers claim that sums earned through their outside occupations and expended by them in the upkeep of themselves and their families are not taxable to them since they are "agents of their religious order." Claiming that the Order is itself tax exempt and that each chapter of the Church is tax exempt, plaintiffs contend that these sums are paid to them in the exercise of their ministries and therefore are not wages under 26 U.S.C. § 3401(a)(9). Alternatively, Church ministers view the gifts and assignments to the chapter of the Order over which they preside as tax deductible charitable contributions under Internal Revenue Code §§ 170(a) and 170(c)(2)(B) (26 U.S.C. §§ 170(a), 170(c)(2)(B)).

Plaintiffs bring this action against the IRS and its District Director for mandamus, injunctive and declaratory relief, and money damages. Plaintiffs allege that defend-

ants have conspired against them and have taken the following actions against them:

1. Audited plaintiffs and disallowed their charitable contributions, assessing negligence and delinquency penalties;

2. Taxed plaintiffs despite their exemption from taxation as a bona fide church and religious organization;

3. Issued notices to plaintiffs stating that the IRS will not recognize their religious organizations;

4. Violated the Internal Revenue Code regarding examination of books of a church by an IRS "pre-examination" questionnaire, which seeks, inter alia, a list of all church charters and ministerial certificates;

5. Violated Congressional policy by inquiring into the services performed by plaintiff ministers;

6. Disseminated false and erroneous information concerning plaintiffs;

7. Caused the maintenance and dissemination of dossiers containing false information about plaintiffs;

8. Libeled plaintiffs by accusing them of being "illegal tax protestors;"

9. Disseminated memoranda linking plaintiff Church with other "mail-order ministries," disregarding whether such ministries require adherence to a creed, dogma, or moral code;

10. Distorted plaintiffs' religious views;

11. Infiltrated private meetings held by plaintiff Church;

12. Singled out "mail-order ministries" over traditional churches for attack;

13. Deprived the Church of funds by discouraging potential contributors; and

14. Disregarded plaintiffs' rights as a religious organization.

These interrelated alleged actions of defendants may be conceptually grouped into three categories. First, plaintiffs allege that defendants have improperly administered the assessment and collection of taxes. See allegations (1) through (5) above. Second, plaintiffs allege that defendants have libeled them and distorted their views.

See allegations (6) through (10) above. Third, plaintiffs allege that defendants have violated their First Amendment freedoms of religion, speech, assembly, and association. See allegations (11) through (14) above. Several of the alleged activities of defendants could, of course, fall under more than one rubric, but the three categories appear to encompass all of plaintiffs' claims.

Plaintiffs seek the following relief:

(1) A declaratory judgment that the course of conduct and activities complained of violate the First Amendment rights of plaintiffs;

(2) Preliminary and permanent injunctions enjoining defendants and their agents from engaging in the activities complained of;

(3) Mandamus ordering the defendants to issue corrective notices to all recipients of false and erroneous information concerning plaintiffs previously distributed by defendants; and

(4) Twenty million dollars compensatory damages.

Defendants have filed a motion to dismiss, contending that this Court is without jurisdiction to grant any of the relief sought by plaintiffs. The three categories set forth above into which plaintiffs' allegations fall will be considered individually.

*A. Improper Assessment and Collection of Taxes.*

Plaintiffs request declaratory and injunctive relief to preclude defendants from continuing their course of conduct in vigorously investigating plaintiffs' eligibility for preferential tax treatment and in disallowing such preferential treatment. It is clear, however, that with regard to tax matters, this Court is without jurisdiction to provide the relief sought.

■ Congress has provided a comprehensive system for seeking review of tax liability in federal courts. Prior to the payment of taxes, taxpayers may seek review in the Tax Court for claimed deficiencies pursuant

to section 6213 of the Internal Revenue Code (26 U.S.C. § 6213). Alternatively, the taxpayer may pay the claimed deficiency and seek review of the disputed IRS determination in the district court by filing for a refund. 26 U.S.C. § 7422; *and see Flora v. United States*, 362 U.S. 145, 157, 80 S.Ct. 630, 637, 4 L.Ed.2d 623 (1960). These two remedies constitute the exclusive means for contesting federal tax liability. *Flora v. United States, supra, and see Kent v. Northern California Regional Office of American Friends Service Committee*, 497 F.2d 1325, 1328 (9th Cir. 1974).

■ This exclusiveness of this Congressional framework is enforced by two important legislative enactments. The first is contained in the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides in relevant part:

In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes* other than actions brought under section 7428 of the Internal Revenue Code of 1954 or a proceeding under section 505 or 1146 of Title 11, any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration.... (Emphasis added.)

By the literal language of this statute Congress has barred federal courts from granting declaratory judgments in tax matters. *Handeland v. C.I.R.*, 519 F.2d 327, 329 (9th Cir. 1975).

The exception extends not only to declarations that certain federal taxes are inapplicable to parties, but also to declarations having the effect of restraining assessment or collection of taxes. In *Ingham v. Hubbell*, 462 F.Supp. 59 (S.D. Iowa 1978), *aff'd*, 596 F.2d 315 (8th Cir. 1979), plaintiffs sought a declaratory judgment regarding the validity of a disclaimer which was executed conditionally upon its tax effects. The District Court held that the suit was precluded by the tax exception in the Declaratory Judgment Act, stating, "[A]ny determination as to the validity of the Disclaimer would be binding upon them and affect the federal tax consequences on this and similar disclaimers." *Id.* at 63.

Clearly, a declaration that defendants' investigation of plaintiffs' tax status is illegal would have the consequence of prohibiting that investigation. This would effectively preclude the IRS from assessing and collecting taxes due, if any, from plaintiffs. Such a result is precluded by the Declaratory Judgment Act.

The Second Circuit has stated:

Quite apart from ... the express exception in the Declaratory Judgment Act removing from the courts the power to declare rights "with respect to Federal taxes," the court cannot presume to speak for the Commissioner or take over his duty to pass upon the tax status of organizations applying for exemption. His duty is to decide whether the particular activities submitted to him justify exemption. He cannot be foreclosed by declaratory judgment from reviewing the purposes and activities of applicants for exempt status when and as they are presented to him for decision.

*Jolles Foundation, Inc. v. Moysey*, 250 F.2d 166, 169 (2d Cir. 1957), quoted with approval in *Mitchell v. Riddell*, 402 F.2d 842, 846 (9th Cir. 1968), *cert. denied*, 394 U.S. 456, 89 S.Ct. 1223, 22 L.Ed.2d 415 (1969).

The second legislative enactment which enforces the congressional scheme for judicial review of federal tax liability is the Anti-Injunction Act, 26 U.S.C. § 7421(a), which provides:

Except as provided in [statutes not relevant here], no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

The purpose of this provision, like that of the tax exception contained in the Declaratory Judgment Act, is to permit the prompt collection by the Government of its lawful revenues with a minimum of pre-enforcement judicial interference. *Bob Jones University v. Simon*, 416 U.S. 725, 736, 94 S.Ct. 2038, 2045, 40 L.Ed.2d 496 (1974); *Thrower*

*v. Miller,* 440 F.2d 1186, 1187 (9th Cir. 1971). Also like the Declaratory Judgment Act tax exception, the Anti-Injunction Act applies if the necessary result of granting the injunctive relief would be to prevent the assessment of any tax. *Blech v. U.S.,* 595 F.2d 462, 466 (9th Cir. 1979); *Bob Jones University v. Connaly,* 472 F.2d 903, 907 (4th Cir. 1973), *aff'd,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974). Since the necessary result of enjoining the investigatory activity of defendants would be to prevent the assessment of Federal Income Tax on the Church and on class members, the Anti-Injunction Act is a bar to the tax aspects of the present action.

Plaintiffs allege that "special circumstances" exist which bring them within the judicially created exception to the Anti-Injunction Act enunciated in *Miller v. Standard Nut Margarine Co.,* 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422 (1932). That exception, as clarified in *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), permits issuance of an injunction restraining the assessment or collection of tax where (1) under no circumstances could the Government ultimately prevail, and (2) equity jurisdiction otherwise exists. *Id.* at 6–7, 82 S.Ct. at 1128–29. As to their tax-related claims, plaintiffs can meet neither of these tests. Although it is premature to attempt to determine plaintiffs' tax contentions on the merits at this time, it is clearly not the case that "under no circumstances" could the Government prevail in this regard. The ultimate determinations will turn on exacting interpretations of Internal Revenue Code §§ 61, 170(c)(2), and 501(c)(3) (26 U.S.C. §§ 61, 170(c)(2), 501(c)(3)). In particular, the ultimate determination of whether the Life Science Church is an organization "operated exclusively for religious purposes" is hardly one which admits of no doubt at this point in the proceedings. Although this fact alone precludes application of the *Standard Nut* exception, it should be noted that plaintiffs are provided by the statutory scheme with ample opportunity for judicial review of these controversies. For example, they may pay the disputed

sums and file for a refund pursuant to 26 U.S.C. § 7422. *See Mitchell v. Riddell, supra,* 402 F.2d at 847. Thus the equity jurisdiction of this Court is foreclosed.

In conclusion, plaintiffs' tax-related claims for declaratory and injunctive relief must be dismissed as the Court has no jurisdiction to hear these claims or to grant the relief requested.

### B. Tortious Conduct Claims (Libel).

Plaintiffs allege that defendants have engaged and are engaging in libeling plaintiffs by disseminating false and erroneous information regarding the Church and its clergy. Defendants contend that they are fully protected from such actions by the doctrine of sovereign immunity and that therefore these claims must be dismissed.

Defendants are correct that the longstanding absolute immunity of federal officers delineated in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), retains its validity in certain circumstances. Under *Barr,* a federal executive officer is absolutely immune from liability for damages arising from action taken "within the outer perimeter of [the officer's] line of duty." *Id.* at 575, 79 S.Ct. at 1341. The Ninth Circuit has held that actions based on state statutes or state common law involving conduct within the outer perimeter of the officer's line of duty continue to be barred by this doctrine. *Miller v. DeLaune,* 602 F.2d 198, 200 (9th Cir. 1979); *Clifton v. Cox,* 549 F.2d 722, 726 (9th Cir. 1977); *see also Mir v. Fosburg,* 646 F.2d 342, 346 (9th Cir. 1980). (Claims alleging libel are additionally specifically excluded from the operation of the Federal Tort Claims Act by virtue of 28 U.S.C. § 2680(h).)

Plaintiffs, however, allege that defendants have acted in *violation* of their statutorily defined duties, not pursuant to them. A federal officer, such as defendant Sassi in this case, is not immune from suit where it is alleged that he acted beyond the scope of his statutory powers. *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed.

1628 (1949); *Starbuck v. City & County of San Francisco*, 556 F.2d 450, 457, fn. 14 (9th Cir. 1977); *see also Dugan v. Rank*, 372 U.S. 609, 621–22, 83 S.Ct. 999, 1007, 10 L.Ed.2d 15 (1963). Nor are suits alleging Constitutional violations completely barred by the sovereign immunity doctrine, as will be discussed below. *Butz v. Economou*, 438 U.S. 478, 495, 98 S.Ct. 2894, 2905, 57 L.Ed.2d 895 (1978).

■ While it may become apparent during the course of this action that defendants were indeed acting fully within the scope of their statutory authority, *cf. Omnibus Financial Corp. v. U.S.*, 566 F.2d 1097, 1101 (9th Cir. 1977), now is not the proper time to pass on such matters. We follow the familiar rule that for the purposes of a motion to dismiss, all material allegations of the complaint are taken to be true and the pleadings are to be liberally construed in favor of plaintiffs. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). Thus, to the extent that plaintiffs have alleged that defendants were acting in violation of their statutorily defined duties, plaintiffs' suit is not foreclosed by the doctrine of sovereign immunity, and plaintiffs' claims alleging the distribution of false and erroneous information may proceed.

*C. Constitutional Claims.*

■ Plaintiffs allege that defendants' course of conduct infringes upon plaintiffs' Constitutional freedoms of religion, speech, association, and assembly. It is necessary at the outset to dispose of two contentions argued by the parties.

First, as indicated above, defendants' belief that they are protected from plaintiffs' Constitutional claims by virtue of the doctrine of sovereign immunity cannot be maintained. The United States Supreme Court in *Butz v. Economou, supra*, firmly established the principle that with rare exceptions federal officials charged with Constitutional violations can claim only the qualified immunity from prosecution enunciated in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

*Scheuer* was a section 1983 civil rights action brought against state officials. The Supreme Court concluded:

> [I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* at 247–48, 94 S.Ct. at 1692.

In *Butz*, the Supreme Court held that no distinction could be drawn for purposes of immunity law between actions brought against state officials under section 1983 and those brought against federal officials directly under the Constitution. *Butz, supra*, 438 U.S. at 504, 98 S.Ct. at 2909. The Court concluded that qualified immunity constituted adequate protection for officials who vigorously exercise the lawful public authority vested in them.

> Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law. But we see no substantial basis for holding, as the United States would have us do, that executive officers generally may with impunity discharge their duties in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule. . . .

*Id.* at 507, 98 S.Ct. at 2911. The Ninth Circuit has recognized the applicability of the qualified immunity doctrine to agents of the Internal Revenue Service. *Mark v. Groff*, 521 F.2d 1376, 1379–80 (9th Cir. 1975). The Constitutional claims of plaintiffs in this case, therefore, cannot be foreclosed by defendants' mere invocations of sovereign immunity on a motion to dismiss.

Second, as defendants correctly assert, the facts alleged by plaintiffs do not make out a cognizable claim under 42 U.S.C. § 1985(3). That section provides in relevant part:

If two or more persons . . . conspire . . . , for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . , whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages. . . .

Actions under this statute must be based on a "racial or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). In *De-Santis v. Pacific Tel. & Tel. Co., Inc.*, 608 F.2d 327, 333 (9th Cir. 1979), the court stated:

While § 1985(3) has been liberated from the now anachronistic historical circumstances of reconstruction America, we may not uproot § 1985(3) from the principle underlying its adoption: the Governmental determination that some groups require and warrant special federal assistance in protecting their civil rights. This underlying principle must continue to determine the coverage of § 1985(3).

Although other barriers to this claim exist, it is sufficient to conclude that members of the Order of Almighty God, ministers of the Church, "mail-order churches," or other self-designations of plaintiffs are not a "class" within the meaning of section 1985(3).

Many readily identifiable groups have been found not to constitute a class entitled to relief under section 1985(3). *See McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 928–29, 931–33 (5th Cir. 1977); *and see Morgan v. Odem*, 552 F.2d 147, 149 (5th Cir. 1977), *reh. denied*, 559 F.2d 29 (5th Cir. 1977). Here, plaintiffs have not pointed to anything in the legislative history of section 1985(3) which provides any suggestion that Congress was concerned in its legislation with the protection of "mail-order churches," nor is it likely that they could do so. Further, it cannot be said that "mail-order churches" or comparable groups have ever been designated a "suspect" or "quasi-suspect" classification or have otherwise been afforded special federal assistance in the protection of their civil rights. Viewed in this light, plaintiffs do not constitute a cognizable "class" under section 1985(3) and their claims under that statute must fail.

Having disposed of these preliminary matters, the Court now turns to the question of whether plaintiffs' Constitutional allegations state a claim upon which relief can be granted. Plaintiffs' claims alleging infringement of their rights of speech, association, and assembly are something less than lucid. While certain elements of defendants' investigation of plaintiffs might arguably be capable of infringing on those rights, *see N.A.A.C.P. v. Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958), plaintiffs appear to have forgotten or at least ignored the

established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action. . . .

*Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937); *see Laird v. Tatum*, 408 U.S. 1, 11–15, 92 S.Ct. 2318, 2324–26, 33 L.Ed.2d 154 (1972). Except for the blanket allegation that the defendants' course of conduct "adversely affects" or "otherwise burdens" plaintiffs' First Amendment rights, plaintiffs do not allege they are any less able to express their beliefs and opinions, to associate freely among themselves, or to gather for any purpose as a result of defendants' conduct. At most, plaintiffs appear to allege that all of the activities of the Life Science Church, including activities involving speech, associations, and assembly have been hampered as the result of defendants' investigation. They claim this in-

vestigation has caused a reluctance by contributors to support the Church financially because of the awareness that donations might not be tax deductible.

The fact that plaintiffs must wait for an assessment before contesting defendants' determination of their tax status does not pose a Constitutional issue.

> [A]lthough the congressional restriction to postenforcement review may place an organization claiming tax-exempt status in a precarious financial position, the problems presented do not rise to the level of constitutional infirmities, in light of the powerful governmental interests in protecting the administration of the tax system from premature judicial interference and of the opportunities for review that are available.

*Bob Jones University v. Simon, supra,* 416 U.S. at 747–48, 94 S.Ct. at 2051–52 (citations and footnote omitted).

In conclusion, plaintiffs have not alleged any constrictive impact of defendants' actions arising "from the present or future exercise, or threatened exercise, of coercive power." *Reporters Com. v. American Telephone & Telegraph,* 593 F.2d 1030, 1052 (D.C. Cir. 1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979); *see Laird v. Tatum, supra,* 408 U.S. at 11, 92 S.Ct. at 2324. Thus, the Court must dismiss plaintiffs' Constitutional claims involving the rights of speech, association, and assembly, but will allow plaintiffs to amend their complaint to allege direct injury.

 Plaintiffs' freedom of religion claims invoke both aspects of the First Amendment provisions regarding religion: the Free Exercise of Religion clause and the Establishment of Religion clause. The former provides: "Congress shall make no law ... prohibiting the free exercise" of religion. Like the Constitutional claims discussed above, Free Exercise claims require a threshold showing of personal coercion in order to place the governmental action before the scrutiny of the courts. "[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of

his religion." *Abington School District v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1962). Apart from their blanket allegation that defendants' conduct has damaged plaintiffs by "adversely affecting their free exercise of religious belief," plaintiffs have failed to allege facts necessary to meet this requirement. Plaintiffs do not allege that they are being injured or penalized by their adherence to religious tenets. Nor do they allege that their actions in furtherance of carrying out their beliefs has been restricted. While it is true that plaintiffs need not allege a *direct* burden imposed on them by defendants' activity, *see Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1960); *Gilette v. U.S.,* 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1970), some burden or coercion must be alleged in order for a claim under the Free Exercise clause to arise. As plaintiffs have failed to allege sufficient facts to establish a coercive effect on plaintiffs' actions by defendants' conduct, plaintiffs' Free Exercise claims must be dismissed, but the Court will grant plaintiffs leave to amend to correct these defects.

Plaintiffs finally raise claims under the Establishment of Religion clause, which provides: "Congress shall make no law respecting an establishment of religion." These claims, unlike those discussed previously, are not affected by plaintiffs' failure to allege a coercion or burden placed upon them by defendants' actions.

> The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce non-observing individuals or not.

*Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266, 8 L.Ed. 601 (1962); *and see Abington School District v. Schempp, supra,* 374 U.S. at 223, 83 S.Ct. at 1572.

The Establishment of Religion clause has been repeatedly interpreted as prohibiting laws which prefer one religion over another.

See *Everson v. Board of Education*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1946); *Buckley v. Valeo*, 424 U.S. 1, 92, 96 S.Ct. 612, 669, 46 L.Ed.2d 659 (1975). The fact that no "law" as such is challenged here does not preclude review of defendants' conduct, because the Supreme Court has extended the operation of the Establishment of Religion clause to governmental activity under authority of law. *See Engel v. Vitale, supra*, 370 U.S. at 422–23, 82 S.Ct. at 1262–63.

 Plaintiffs allege that defendants have singled out "mail-order ministries" for investigation and have described "mail-order ministries" such as plaintiffs' as members of "the illegal tax protestor movement." This Court has no jurisdiction, as discussed above, to decide whether "mail-order ministries" such as plaintiffs' are or are not entitled to preferential tax treatment. However, to the extent that it is alleged that defendants invidiously discriminate between churches in their investigatory procedure on the basis of whether a church relies almost exclusively on the mails for the furtherings of its teachings, plaintiffs have stated a claim upon which relief can be granted.

It is important to distinguish between an investigation by defendants into the tax status of an organization calling itself a church, on the one hand, and a burden placed on an organization professing to further religious beliefs, on the other hand. Defendants clearly have the authority, pursuant to 26 U.S.C. § 7601(a) and Treasury Regulations § 301.7605–1(c)(3)(i) and (ii), *inter alia*, to inquire into and vigorously investigate plaintiffs' status as taxpayers. But the provisions of the Internal Revenue Code do not delineate the protections embodied in the First Amendment. The Establishment of Religion clause prohibits governmental discrimination among religions, whether or not the organizations professing those religions are tax exempt. And, apart from narrow exceptions not relevant here, "it is not business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment." *Fowler v. Rhode Island*, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1952). Plaintiffs therefore state a claim under the Establishment of Religion clause.

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part. To the extent that the Court permitted amendment of the complaint, plaintiffs shall have 30 days from the date of this Order to amend.

IT IS SO ORDERED.