**Timothy N. TAUVAR, Plaintiff,**

v.

**BAR HARBOR CONGREGATION OF THE JEHOVAH'S WITNESSES, INC., et al., Defendants.**

**Civ. No. 84–0132–B.**

United States District Court,
D. Maine.

September 9, 1985.

Affirmed by First Circuit
March 26, 1986.

Judgment affirmed, 1st Cir., 787 F.2d 579.

Raymond L. Williams, Silsby & Silsby, Ellsworth, Me., for plaintiff.

Marvin H. Glazier, Edward W. Gould, Bangor, Me., Theodore H. Kirchner, Portland, Me., Leslie R. Long, Brooklyn, N.Y., David H. Simonds, Bangor, Me., for defendants.

## MEMORANDUM DECISION ON OBJECTIONS TO MAGISTRATE'S RECOMMENDED DECISION

CYR, Chief Judge.

The plaintiff, a "disfellowshipped" member of the Jehovah's Witnesses,[1] seeks damages and injunctive relief against the Inhabitants of the Town of Bar Harbor, Maine, the Bar Harbor Congregation of the Jehovah's Witnesses, Inc. [Congregation], Watchtower Bible and Tract Society [Watchtower] (the Congregation's parent organization), several of the Congregation's elders, and two Bar Harbor police officers, arising out of plaintiff's exclusion from the Congregation's worship services. The complaint alleges that on August 27 and August 30, 1981, and April 1, 1984 the defendants, acting in concert, utilized Maine's criminal trespass statute as a pretext for abridging plaintiff's constitutional rights to free speech, freedom of religion, association and conscience, and equal protection of the laws. The defendants deny any abridgement of plaintiff's constitutional rights or that they conspired to do so, and they assert numerous affirmative de-

---

1. According to the plaintiff, a "disfellowshipped" member of the Jehovah's Witnesses is one who, though still a member of the Jehovah's Witnesses, is no longer considered a member in "good standing." Thus, once "disfellowshipped," a member may still attend public meetings, but may not enter the private home of

fenses. The "private" defendants[2] moved to dismiss the complaint for failure to state a claim upon which relief can be granted; the defendant police officers and the Inhabitants of the Town of Bar Harbor moved for summary judgment. After a consolidated hearing, the United States Magistrate issued a decision recommending that, with the exception of officer Herrick's motion for summary judgment on Count I of the complaint,[3] defendants' motions be granted. All parties filed timely objections to various portions of the Magistrate's recommended decision.[4]

## I. FACTUAL OVERVIEW

The facts surrounding the events set forth in plaintiff's complaint are not seriously disputed. The record discloses that on the evening of August 27, 1981, plaintiff arrived at the Congregation's Kingdom Hall [Hall] in Bar Harbor for the purpose of attending the Congregation's Thursday evening meeting or worship service.[5]

a member in good standing. Tauvar Deposition, at 12–13, 44, 160.

2. The "private" defendants are Watchtower, the Congregation and the named elders.

3. Count I relates to the events surrounding plaintiff's arrest for criminal trespass by officer Herrick on August 30, 1981. The Magistrate did not mention or rule on officer Herrick's motion for summary judgment on Count I. The Magistrate did grant officer Herrick's motion for summary judgment on Counts II and III of the Complaint, on the ground that Herrick was not named in these two counts. *See* Recommended Decision, at 4.

4. In their various memoranda and at oral argument before the Magistrate, all defendants argued that plaintiff's section 1983 claim was barred by the statute of limitations. Relying on *Wilson v. Garcia,* — U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Magistrate determined that Maine's six-year statute of limitations, 14 M.R.S.A. § 752, applied. Recommended Decision, at 2–3. Because the court agrees with the Magistrate's recommendations granting the defendants' motions to dismiss and for summary judgment, it is unnecessary to decide the statute of limitations issue.

Plaintiff has not objected to the Magistrate's decision recommending that summary judgment be granted in favor of the Inhabitants of the Town of Bar Harbor.

Upon arrival plaintiff proceeded to the rear of the Hall where he remained throughout the service. At the close of the service, a member of the Congregation engaged the plaintiff in conversation, at which point Stuart Quinn, one of the Congregation's elders, allegedly grabbed plaintiff's wrists and told plaintiff that he was not to speak with anyone inside the Hall. Plaintiff suggested that Quinn contact the police to resolve the situation. Tauvar Deposition, at 96–100.

Responding to a call requesting police assistance, officer Robert Webber of the Bar Harbor Police Department arrived at the Hall to investigate. According to officer Webber, he was told by one of the Congregation's elders, Lorenzo Creamer, that plaintiff was disrupting the service and that he had done so on several occasions in the past.[6] Affidavit of Robert Webber, ¶ 6. Officer Webber spoke with the plaintiff, who informed the officer that he had a right to attend the Congregation's

5. From 1966 to 1970 or 1971, plaintiff was actively involved with Watchtower at its headquarters in New York City, where he assisted in the organization's printing operations and apparently became an elder for a congregation in that city. After a dispute with the Watchtower hierarchy in the fall of 1970, plaintiff was assigned by Watchtower to Fort Kent, Maine, as a "special pioneer." Because of a dispute with local church officials, plaintiff was "disfellowshipped" in November 1971. Between 1971 and 1981, plaintiff lived in Maine and traveled to various communities attending public meetings of the Jehovah's Witnesses. For reasons not entirely clear, after a short period of time plaintiff was denied access to most of these meetings, except in Bangor, and, between 1973 and 1981, in Bar Harbor. Tauvar Deposition, at 4, 9–10, 17–18, 21–31, 35–36, 44, 52, 59, 62–63, 82, 95.

6. According to the plaintiff, on August 23, 1981 officer Herrick had been dispatched to the Hall after receiving a complaint from the Congregation that plaintiff was parading in front of the Hall carrying signs and pronouncing publicly his religious beliefs. Plaintiff's Answers to Defendants' Interrogatories Nos. 3 and 7. According to his deposition, plaintiff admits that he paraded outside the Hall and spoke publicly on many occasions, but denies that he caused any disturbance. Tauvar Deposition, at 112–113.

services. After further discussion officer Webber informed plaintiff that if he did not leave the Hall he would be arrested. Plaintiff voluntarily left the Hall. Tauvar Deposition, at 101–102; Affidavit of Robert Webber, ¶ 6.

On August 30, 1981 plaintiff returned to the Hall with his wife for the purpose of attending the Sunday morning worship service. As plaintiff attempted to enter the Hall, a Congregation elder told plaintiff that he was not welcome. Nevertheless, plaintiff entered the Hall and sat down. Tauvar Deposition, at 103–105. Responding to a call for assistance in removing an "unwanted trespasser" from the Hall, officer Daniel Herrick proceeded to the Hall where he was met by Lorenzo Creamer. The officer entered the Hall and advised plaintiff that he had been contacted by the Congregation and that the elders wanted plaintiff removed from the Hall. In the presence of officer Herrick, Creamer twice requested that plaintiff leave. Plaintiff responded that his right to attend the Congregation's public meetings was protected by several court cases,[7] and that he would not leave. After again being requested to leave, officer Herrick arrested plaintiff for criminal trespass.[8] Plaintiff was escorted from the church, frisked, handcuffed and transported to the station house.[9] Affidavit of Daniel Herrick, Exhibit A.

On April 1, 1984 plaintiff flew from California to Bar Harbor to attend services at the Hall, for the alleged purpose of vindicating his asserted right to attend the Congregation's public services. Tauvar Deposition, at 119. Once again the elders requested police assistance and officer Webber was dispatched to the Hall. Because of his previous involvement with the plaintiff and his awareness of plaintiff's previous arrest for criminal trespass on August 30, 1981, and on the instructions of the chief of police, officer Webber contacted the district attorney for advice. According to officer Webber, the district attorney advised the officer to request that the elders ask plaintiff to leave and, if plaintiff refused, officer Webber should request that plaintiff leave. The district attorney advised the officer to arrest the plaintiff if he again refused to leave. Affidavit of Robert Webber, Exhibit A. Acting on the district attorney's advice, officer Webber proceeded to the Hall where he met elder Benjamin Long.[10] Long related that plaintiff had caused disturbances in the past and that the Congregation wished to avoid any further problems. Long then approached the plaintiff and, in the officer's presence, requested

---

7. In 1973 officer Webber arrested the plaintiff for disorderly conduct arising out of an apparent disturbance at the Hall. Plaintiff states that the charge was subsequently dismissed by a state superior court, but does not state the basis for the dismissal. Tauvar Deposition, at 83. *See* Complaint, ¶ 11.

8. Maine's criminal trespass statute provides in relevant part:

   1. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so:

   ....

   D. He remains in any place in defiance of a lawful order to leave, which was personally communicated to him by the owner or other authorized person; ...

   17–A M.R.S.A. § 402(1)(D).

9. On appeal to the Maine Supreme Judicial Court [Law Court] plaintiff's conviction was reversed due to a defective jury instruction. *State v. Tauvar*, 461 A.2d 1065 (Me.1983). The Law Court held that "for the purposes of the criminal trespass statute an order to leave property to which the public had been invited is lawful only when the owner has some justification." *Id.* at 1067. Since the State had presented evidence that plaintiff had created a disturbance at the meeting hall in the past, the Law Court vacated the judgment and remanded the case to the superior court. The Law Court specifically rejected plaintiff's contention that the criminal trespass statute "impermissibly abridges his right to the free exercise of his religion under state and federal guarantees," and concluded that there was "no denial of access to a public forum for the exercise of Tauvar's rights of free speech or assembly." *Id.* at 1068. On remand the state dismissed the charges.

10. Plaintiff asserts that officer Herrick accompanied officer Webber to the Hall on April 1, 1984. Tauvar Deposition, at 137. Officer Webber's affidavit makes no mention of officer Herrick being present nor is the court able to find any other evidence placing officer Herrick at the scene on April 1, 1984. *Accord* Complaint, ¶¶ 25–33.

that plaintiff leave, explaining that, due to plaintiff's past conduct it was expected that he would disrupt the service. After being informed by Officer Webber that if he did not leave he would be arrested, plaintiff left the Hall. Affidavit of Robert Webber, Exhibit A; Tauvar Deposition, at 116–118.

## II. DISCUSSION

### A. *Section 1985*

In recommending that defendants' motions to dismiss and for summary judgment on plaintiff's section 1985 claim be granted, the Magistrate concluded that plaintiff failed to allege or show facts demonstrating the existence of any racial or class-based discriminatory animus. Recommended Decision, at 3.

To make out a violation of section 1985(3)[11] plaintiff must allege and prove four elements:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 829, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983), *citing Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91

S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). As the Supreme Court has made clear, not only must the conspiracy have as its purpose the deprivation of equal protection of the laws, it must also be shown that there was "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. at 102, 91 S.Ct. at 1799.

To survive a motion to dismiss, a complaint alleging a violation of section 1985(3) must, at a minimum, ' "allege facts showing that the defendants conspired against the plaintiff[ ] because of ... [his] membership in a class and that the criteria defining the class were invidious." ' *Hahn v. Sargent*, 523 F.2d 461, 468–69 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), *quoting Harrison v. Brooks*, 519 F.2d 1358, 1359–60 (1st Cir. 1975). *See also Daley v. Town of New Durham*, 733 F.2d 4, 7 (1st Cir.1984). Plaintiff's complaint fails to mention *any* class, let alone to contain any description of a class of persons, or group, that is sufficiently definite or precise to set against the "class of persons" terminology used in section 1985(3).

In his deposition, plaintiff does variously refer to "disfellowshipped" members of the Jehovah's Witnesses, members of the general public, and individuals generally with religious beliefs different than those of the Jehovah's Witnesses, as the "class" of which he is a member. Tauvar Deposition, at 123–24. Plaintiff also states that his religious views reflect doctrinal differences

**11.** Section 1985(3) provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the elec-

tion of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
42 U.S.C. § 1985(3).

with the religious views advocated by the Jehovah's Witnesses.[12] *Id.* at 181–83. Yet beyond these general statements it is unclear precisely what is the composition of the "class." Plaintiff simply refers to people who have been thrown out of the Jehovah's Witnesses, Tauvar Deposition, at 142, and states that because of certain doctrinal differences Watchtower has prevented "our" attendance at the organization's public meetings, *id.* at 145. However, plaintiff also states that the Congregation welcomes members of all faiths, including "disfellowshipped" members of the Jehovah's Witnesses, and that individuals who share plaintiff's particular views, *see* note 12 *supra*, attend public meetings of the Jehovah's Witnesses. Tauvar Deposition, at 158, 160, 161–62.[13]

Even assuming that plaintiff can establish a class of similarly situated "disfellowshipped" members of the Jehovah's Witnesses, plaintiff's section 1985(3) claim must fail.[14] "The requirement that the discrimination be 'class-based' is not satisfied

by an allegation that there was a conspiracy which affected the interests of the class of persons similarly situated with the plaintiff[ ]." *Harrison v. Brooks*, 519 F.2d at 1359–60. Since plaintiff himself asserts that the Congregation welcomes "disfellowshipped" members to its public meetings, as well as individuals who share plaintiff's particular religious views, plaintiff has neither alleged nor presented facts to show either a conspiracy directed at the plaintiff because of his membership in a class of "disfellowshipped" Jehovah's Witnesses or that the criteria defining this class were invidious. Opprobrious epithets do not satisfy the requirements of section 1985(3). Accordingly, the court ACCEPTS the Magistrate's recommendation GRANTING the defendants' motions to dismiss and for summary judgment on plaintiff's section 1985 claim.

### B. *Private Defendants*

■ Under section 1983 the initial inquiry must focus on whether the conduct

---

**12.** As a result of these doctrinal differences plaintiff founded the Christian Prophets of Jehovah, Inc. in 1979. This group is not made up solely of "disfellowshipped" members of Jehovah's Witnesses, but has members of many faiths. Tauvar Deposition, at 181. And although members of plaintiff's organization hold beliefs different than those of the Jehovah's Witnesses, the thrust of their activity is not so much directed at the Jehovah's Witnesses, but rather focusses on unifying disparate Christian sects. *Id.* at 154–55. Plaintiff does not contend that the Christian Prophets of Jehovah, Inc. is the "class" allegedly being discriminated against. *See* Plaintiff's Objections to Magistrate's Recommended Decision, at 1.

**13.** Plaintiff states as much in his Statement of Material Facts In Opposition To Defendants' Motion For Summary Judgment, at 5. There plaintiff states that "ever since the doctrinal disputes between himself and the Watchtower society arose, ... the Watchtower society and the local congregations have been breaking laws to prevent [plaintiff's] attendance at meetings." *Id.* Of course, where an alleged conspirator's actions are directed against one as an individual, but not because that individual is a member of a particular class, a section 1985(3) claim cannot be maintained. *See Weiss v. Patrick*, 453 F.Supp. 717, 724 (D.R.I.1978).

**14.** Whether a given "class" is entitled to invoke the protections of section 1985(3) remains the subject of considerable debate. *See generally,*

*Hobson v. Wilson*, 737 F.2d 1, 21 (D.C.Cir.1984). And although a number of courts have found that section 1985(3) extends to discrimination against ascertainable religious groups, *see, e.g., Taylor v. Gilmartin*, 686 F.2d 1346, 1356–57 (10th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983); *Ward v. Connor*, 657 F.2d 45, 47–48 (4th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982); *but see Life Science Church v. IRS*, 525 F.Supp. 399, 406 (N.D.Calif.1981) [mail-order churches or other comparable groups not a "class" within meaning of § 1985(3) ], the reach of section 1985(3) may be limited after the Supreme Court's decision in *Carpenters & Joiners etc. v. Scott, supra; see, e.g., Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir.1985) [decision in *Scott* buttresses limited reach of § 1985(3) to classes that courts have designated as suspect or quasi-suspect class or where Congress has indicated through legislation that class requires special protection]; *Wilhelm v. Continental Title Co.*, 720 F.2d 1173, 1176 (10th Cir.1983) [*Scott* buttresses view that handicapped persons not a class for purposes of § 1985(3) ], *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984). Because plaintiff has neither alleged nor presented facts pointing to any invidiously discriminatory animus directed toward "disfellowshipped" Jehovah's Witnesses, it is unnecessary to decide whether this group constitutes a "class" within the intended reach of § 1985(3).

complained of was committed by a person acting under color of state law and whether that conduct deprived the plaintiff of rights, privileges and immunities secured by the Constitution. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981); *Vontour v. Vitale,* 761 F.2d 812, 819 (1st Cir.1985). Concluding that the plaintiff failed to allege action by the named Congregation elders "under color of state law," or any cooperation between the Congregation, Watchtower and the defendant police officers, the Magistrate granted the private defendants' motions to dismiss plaintiff's section 1983 claim.

It is well settled that private persons may be held liable under section 1983 where, *inter alia*, the private parties conspire with or are otherwise willful participants in joint activity with the state or its agents. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970); *Glaros v. Perse,* 628 F.2d 679, 685 (1st Cir.1980). Plaintiff's complaint alleges that the named elders of the Congregation "acted in concert in requesting that [a police officer] order the plaintiff to leave [the Hall]," Complaint, ¶¶ 12, 30, 43, and that "[i]n doing the acts and things ... complained of, defendants were conspirators engaged in a scheme and conspiracy designed and intended to deny and deprive plaintiff of [his] rights ...," Complaint, ¶¶ 22, 35, 48.

As with actions under section 1985(3), bare conclusory allegations of conspiracy cannot survive a motion to dismiss. For purposes of satisfying the section 1983 requirement of action under color of state law, the plaintiff must plead in some detail, through reference to material facts, the relationship or nature of the cooperation between the state actors and the private individuals. *See McGillicudy v. Clements,* 746 F.2d 76, 77 (1st Cir.1984) [and cases cited]. Plaintiff's complaint "contains frequent references to conspiracy, but it offers few insights into the specific nature of the alleged concerted action," *Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977). For example, the complaint is devoid of any

reference to facts alleging a "plan" or "preconceived scheme" among officers Webber and Herrick and any of the private defendants, *see, e.g., Auster Oil & Gas, Inc. v. Stream,* 764 F.2d 381, 387–88 (5th Cir.1985), or that the officers were so involved in every step of the elders' conduct toward the plaintiff as to cloak the conduct of the elders with the "color of state law" which attaches to the officers' own action, *see, e.g., Howerton v. Gabica,* 708 F.2d 380, 385 (9th Cir.1983). Nor can it be fairly said that "the very events alleged [in the complaint] will lead to an inference that private action was taken under color of state law," *Glaros v. Perse,* 628 F.2d at 685. The complaint alleges that, in responding to three calls for assistance, officers of the Bar Harbor Police Department proceeded to the Hall, investigated the circumstances, and acted. Certainly plaintiff does not suggest that the requisite "joint action" is established merely by virtue of the fact that the elders' contacted the police on three different occasions. *Benavidez v. Gunnell,* 722 F.2d 615, 618 (10th Cir.1983) [Report of a state crime not considered action under color of state law]. *Cf. Cruz v. Donnelly,* 727 F.2d 79, 81 (3d Cir.1984) [no evidence that, in responding to call for assistance, police officers subordinated their judgment to that of private parties]; *Hernandez v. Schwegmann Brothers Giant Supermarkets, Inc.,* 673 F.2d 771, 772 (5th Cir.1982) [police officers' reliance on information provided by private citizen at scene of alleged crime does not convert informing party into state actor]. *But see Howerton v. Gabica,* 708 F.2d at 385 [repeated requests for police assistance in evicting tenant, coupled with police involvement in every step of private eviction, constituted joint action].

Even considering plaintiff's deposition testimony, hinting at a wider conspiracy, plaintiff's "conspiracy" claim amounts to nothing more than the conclusory and totally unsupported assertion that officers' Webber and Herrick should have known that plaintiff had the right to attend the

Congregation's public meetings.[15] Other than the fact of the officers' prior encounters with the plaintiff, plaintiff has failed to put forth any facts showing cooperation between the officers and the elders sufficient to state a claim under section 1983.

The court also agrees that plaintiff has failed to allege facts showing any relationship or cooperation between the police officers and the Congregation and Watchtower. The complaint alleges only that the Congregation was "receiving instructions" from Watchtower. Complaint, ¶¶ 7, 25, 38. The gist of plaintiff's argument is that the named elders conspired with the police officers and since the elders were members of the Congregation, which received its instructions from Watchtower, therefore the Congregation and Watchtower were engaged in joint activity. The complaint contains no factual allegations remotely suggesting an independent link between the Congregation and Watchtower and the police officers. Since the court finds that plaintiff has failed to show that the named elders were participants in joint activity with the police or with any other state actor, it follows that the Congregation and Watchtower were not acting under color of state law. Accordingly, the court ACCEPTS the Magistrate's recommendation GRANTING the private defendants' motions to dismiss plaintiff's section 1983 claim.

### C.  *Officers Webber and Herrick*

■ Defendants Webber and Herrick moved for summary judgment on their af-firmative defense of qualified immunity. Without discussing officer Herrick's motion, *see* note 3 *supra,* the Magistrate determined that the uncontradicted record facts established that officer Webber had acted in good faith. Recommended Decision, at 4–8. Summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[16]

Police officers do not enjoy absolute immunity from civil liability under section 1983. Rather, they enjoy qualified immunity in the good faith performance of their duties. *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The general rule of qualified immunity, set out in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The standard of qualified immunity set forth in *Harlow*

eliminates from consideration allegations about the official's subjective state of mind, such as bad faith or malicious intention, concentrating the inquiry upon the 'objective reasonableness' of the offi-

---

**15.** A sampling of plaintiff's allegations of a conspiracy between the police officers and the Congregation elders includes: (1) plaintiff's wife did not attend the August 27, 1981 meeting; (2) the police arrived very quickly on August 30, 1981; (3) the officers and the Congregation elders "could have had some private conversation away from [plaintiff's] ears;" (4) the officers were aware that his 1973 arrest for disorderly conduct had been "dismissed" by a state superior court; (5) the officers broke the law; and (6) plaintiff notified the Bar Harbor town manager of the officers' conduct and the town did not reprimand the officers.

**16.** Plaintiff objected to the Magistrate's decision, recommending that officer Webber's motion for summary judgment be granted, on the grounds that the Magistrate failed to consider plaintiff's answers to defendants' interrogatories, and that "the contents of the answers to the interrogatories does (sic) contradict [Webber's] factual assertions concerning what took place." Plaintiff's Objections To Magistrate's Recommended Decision, at 2. Plaintiff's objections, as with his memoranda, *see, e.g.,* Plaintiff's Statement Of Material Facts, at 4–5, fail to set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Reference to the "record" generally is not enough and fails to comply with the rules of this court. *See* D.Me. Local Rule 19(b)(2). *Cf. Bryson v. Royal Business Group,* 763 F.2d 491 (1st Cir.1985).

cial conduct. Under this standard, the reasonableness of the official conduct is not measured against the official's *actual* knowledge of constitutional standards and the probable constitutionality of his or her action, but rather against a relatively uniform level of 'presumptive knowledge' of constitutional standards. *Floyd v. Farrell,* 765 F.2d 1, 4–5 (1st Cir. 1985) (citations and footnote omitted). *See also Blackburn v. Snow,* 771 F.2d 556 (1st Cir.1985).

Plaintiff does not challenge officer Herrick's probable cause to arrest plaintiff for criminal trespass on August 30, 1984.[17] Rather, notwithstanding an apparently valid application of the criminal trespass statute, plaintiff seems to argue that officers Webber and Herrick utilized the statute for the purpose of abridging plaintiff's first amendment rights.[18] Thus considered, the issue for purposes of the qualified immunity analysis is whether, by arresting or threatening to arrest the plaintiff for criminal trespass, another officer, standing in the shoes of officers Webber and Herrick and having the same information they had, would reasonably have come to the conclusion that such action was violative of clearly established first amendment rights. *Cf. Floyd v. Farrell,* 765 F.2d at 5.

The undisputed facts are that on each of the three occasions in question police officers were dispatched to the Congregation's Kingdom Hall in response to a call for assistance. Upon their arrival the officers first spoke with one of the Congregation's elders and then confronted the plaintiff. In the presence of the officers, plaintiff was requested to leave the Hall by one of the elders. On two occasions (August 27, 1981 and April 1, 1984), plaintiff voluntarily left the Hall after being informed by officer Webber that he would be arrested if he did not leave. On August 30, 1981 plaintiff refused to leave the Hall after being requested to do so, and was arrested by officer Herrick for criminal trespass.

Plaintiff contends that officers Webber and Herrick were aware of certain facts which demonstrated that the "real" purpose behind the officers' actions was to deprive plaintiff of his constitutional rights. *See* note 16 *supra.*

In answers to interrogatories, plaintiff asserts that officer Webber had arrested the plaintiff for disorderly conduct in 1973, arising out of plaintiff's attempt to attend a Congregation meeting, *see* note 7 *supra,* and that those charges were dismissed. Plaintiff asserts that on August 27, 1981 he reminded officer Webber of the 1973 incident, and therefore that Webber should have known that his invocation of the criminal trespass statute was violative of plaintiff's constitutional rights. Plaintiff also contends that officer Webber persisted in his unlawful conduct on April 1, 1984, despite the Law Court's opinion vindicating plaintiff's "freedoms." Plaintiff's Answers to Defendants' Interrogatories, No. 1. *See* note 9 *supra.*

As to officer Herrick, plaintiff contends that the officer was not only aware of the 1973 incident and of the dismissal of the disorderly conduct charge, but that officer Herrick was fully aware of plaintiff's activities, and that, despite "much public clarification" of plaintiff's asserted rights through the local news media, officer Herrick utilized his position as a police officer to deprive plaintiff of his constitutional rights. *Id.*

To the extent that plaintiff asserts these facts to show that the officers acted with malicious intent, *Harlow* makes clear that neither the officers subjective assessment of these "facts" nor the actual motives for

---

**17.** In order to defeat officer Herrick's defense of qualified immunity on the issue of probable cause plaintiff would have to show that there "clearly was no probable cause at the time the arrest was made," *Floyd v. Farrell,* 765 F.2d at 5.

**18.** In his complaint plaintiff refers to officer Herrick's use of "excessive force" in arresting the plaintiff. Although plaintiff has not pursued this claim either before the Magistrate or before this court, the court is entirely satisfied that officer Herrick's conduct in arresting the plaintiff did not constitute excessive force. *See, e.g., Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981).

their conduct are to be considered in evaluating a qualified immunity defense. *Floyd v. Farrell*, 765 F.2d at 6. Furthermore, even to the extent that these "facts" are directed to the officers' actual knowledge and therefore to the objective reasonableness of the officers' conduct they are insufficient to pierce the officers' defense of qualified immunity.

Plaintiff's assertion that the 1973 disorderly conduct charge was "dismissed" by a state superior court and that his 1981 conviction for criminal trespass was overturned on appeal do not establish that those court actions amounted to a "vindication" of his asserted constitutional rights. Plaintiff has not provided the court with the basis on which the disorderly conduct charge was dismissed. With respect to the criminal trespass conviction, the Law Court specifically grounded its reversal on statutory interpretation and held against plaintiff on his claim that his conduct, at least with respect to the events on August 30, 1981, was protected by the first amendment. Beyond his conclusory assertions, plaintiff has failed to point to specific record evidence which either directly or inferentially suggests that officers Webber and Herrick were aware that their actions had been determined by any court to have been violative of plaintiff's first amendment rights.[19] That plaintiff says it is so does not make it so. If anything, to the extent that the Law Court's decision dealt with first amendment issues, it informed the officers to the contrary.

Accordingly, the court ACCEPTS the recommendation of the Magistrate GRANTING officer Webber's motion for summary judgment on his defense of qualified immunity. Further, after a careful review of the record the court directs that officer Herrick's motion for summary judgment on his defense of qualified immunity be GRANTED.

SO ORDERED.

---

**19.** Even assuming that officer Webber was aware of the Law Court's decision vacating plaintiff's 1981 criminal trespass conviction, and of the rule of law announced in the decision, *see* note 9 *supra,* officer Webber contacted the district attorney for instructions and followed those instructions. This clearly buttresses the officer's qualified immunity defense on the basis of good faith compliance with the law. *Cf. Blackburn v. Snow*, 771 F.2d 556, 569 (1st Cir. 1985) [fact that, *inter alia,* sheriff consulted no legal authority before imposing blanket-search requirement for visitors to county prison undermines any claim that sheriff behaved like a "reasonable person"].